PETER BECKMAN, Administrator, Appellant, v. THE CONSOLIDATION COAL COMPANY.

Injury to Servant: Contributory Negligence. Where intestate's death was caused by an open switch which it was his duty to keep closed, his estate can not recover. (1)

ASSUMING RISK OF EMPLOYMENT. Intestate had been employed in defendant's mine for a year and a half, was familiar with the switch, knew that it was often left open and that loaded cars were frequently pushed unattached to a train or cable, as the one that injured him was, and made no complaint, nor asked for any change. *Held,* that he assumed the risk incident to such a condition of things. (2)

Directing Verdict: Rule. A verdict will be directed when, considering all the evidence, it appears to the court, that it would be its duty to set aside a verdict if found for the party having the burden of proof. *Myer v. Houck,* 85 Iowa, 319, *followed.* (2)

*Appeal from Mahaska District Court.*—HON. J. K. JOHNSON, Judge.

FRIDAY, FEBRUARY 2, 1894.

PLAINTIFF alleges that he is administrator of the estate of William B. Johnson, deceased; that said

Johnson came to his death while in the employ of defendant, because of certain specified acts of negligence on the part of defendant, wherefore he asks to recover damages.  Defendant answered, denying generally, and alleging a waiver by the deceased as to the matters alleged as negligence, and that he was guilty of contributory negligence.  At the close of all the evidence, the court, on motion, directed a verdict for the defendant, and entered judgment thereon, from which judgment plaintiff appeals.—*Affirmed.*

*L. C. Blanchard* for appellant.

*J. F. & W. R. Lacey* for appellee.

GIVEN, J.—I.  The defendant was engaged in operating a coal mine, and the deceased was employed by the defendant to perform certain duties in the mine, and while so employed was struck and run upon by a loaded car, and killed.  The following statement as to the arrangement of the mine, the duties of deceased, and the manner in which the accident occurred, will be sufficient for a correct understanding of the case:  The mine was reached by a shaft in which two cages or elevators were operated, which we designate as the east and the west cage.  From the bottom of the shaft the main entry extended south, with cross entries and rooms on each side, from which coal was brought in cars to be taken to the shaft and elevated to the surface.  A track of iron rails for the passage of cars extended from the bottom of the shaft, south, along the main entry.  Cars were operated on this track by means of an endless cable carried on rollers above and below the cars, propelled by a steam engine at the top of the shaft.  Trains coming to the shaft took up loaded cars at points along the main entry to where they were drawn by mules from the different rooms. The cars were usually coupled together, and, when

ready to be moved, were connected with the moving cable. It was a common practice to take one or more cars onto the head of the train, and push them to the shaft without coupling them to the other cars or to the cable. At a point ninety feet south of the bottom of the shaft, what is called the empty track branched to the west from the main track, running thence to the landing of the west cage; the main track continuing to the landing of the east cage. Loaded cars from the mine were run upon the main track to the east landing. Empty cars returned from the top stood upon the empty track until taken in to be loaded. The switch by which the empty track was connected with the main track was a "spring switch," that opened and closed by the passage of cars from the empty to the main track, and which could be "latched" so that it would not close, but leave the empty track connected with the main track until unlatched. Mining was not carried on at night, but men were then engaged in taking timbers into the mine, for props, on timber cars, which were usually run over the empty track. These night men frequently latched the switch, and left it so, thereby leaving the empty track connected with the main track. The duty of the deceased, under his employment, was to go along the track, oil and repair the rollers, oil the switches, and report any repairs necessary to be made on them that he could not make, and to remove any pieces of coal or other obstructions that he found upon the track. On the morning of November 12, 1890, the deceased commenced work at the foot of the shaft, and when within twenty or thirty feet of said switch, and while on the east side of the main track, warning was given of a loaded train approaching from the south, whereupon he stepped west, across the main track, onto the empty track. Because of the switch being open, the cars ran in on the empty track; the first car running upon the deceased

and injuring him so that he died in a few hours afterward. Said front car was not coupled to the train or to the cable, but it did not separate from the other cars, but was pushed upon the deceased by them.

II. The negligence charged is, in substance, as follows: *First.* Defendant failed to provide a safe and convenient switch, and proper appliances for adjusting the same; the switch being a spring switch, which is not a safe switch, nor the most approved in use. *Second.* That defendant negligently failed to provide a safe place for plaintiff's intestate to work; that said Johnson was not aware of the unsafe condition of the switch, nor that the same was unguarded and open. *Third.* Defendant negligently failed to keep a man at said switch to adjust the same and keep it in proper place, which it was its duty to do. *Fourth.* By reason of the manner of the operation of the railroad, in not fastening the front car to the train nor to the cable. *Fifth.* That defendant had negligently failed to keep said switch in its proper position, and negligently allowed said switch to remain open at the time said train approached and ran into the same. Question is made in argument whether these are charges of negligence against the defendant directly, or of the coemployees of the deceased, and whether section 1307 of the Code applies to this case, so as to make the defendant liable to employees for the negligence of their coemployees. In the view we take of the case, it is unnecessary that we determine these questions.

Assuming that defendant is liable for all the acts of negligence charged, we inquire whether, under the evidence, the court erred in directing a verdict for the defendant. "Our conclusion is that, when a motion is made to direct a verdict, the trial judge should sustain the motion, when, considering all of the evidence, it clearly appears to him that it would be his duty to set aside a verdict, if found in favor of the party upon

whom the burden of proof rests." *Meyer v. Houck*, 85 Iowa, 319, 52 N. W. Rep. 235. The cause of this accident was that the cars ran in upon the empty track, instead of keeping upon the main track, as was intended, and as deceased, no doubt, expected. That this was caused by the switch being open, there is no doubt. The evidence shows that this kind of switch was in common use in that kind of tracks, and there is no evidence that it was not an approved appliance, or that it was defective or out of repair. True, one Calvert, in describing the switch, said: "It has been a common occurrence,— running off the track there; that is, they ran off frequently. That occurred by a negligence in shoving the switch,—that is, putting this lever on,—and they (night men) would leave it open." This does not show that the switch was an improper appliance, or out of order, but only that it had not been properly closed by the night men, in consequence of which passing cars ran in onto the empty track. The employment of the deceased required him to go on and along the track, which was a place of danger,—danger, the hazard of which he assumed in accepting his employment. There is no evidence that the defendant omitted any precaution, in arranging the place for deceased to work, that would have rendered his employment less dangerous. The switch being constructed to close itself after the passage of cars from the empty track onto the main track, thus leaving the main track open for the passage of cars thereon, there was no necessity for keeping a man at the switch to adjust and keep it in place. There is no evidence that the switch ever failed to open and close as intended, except when it was latched so as to prevent it from opening and closing. The fact that the car that ran upon deceased was not attached to the train or to the cable was not the cause of the accident, for it is shown that that car did not separate from the train; and it is evident that the accident would have occurred,

even though that car had been attached to both the train and the cable.

The evidence certainly does tend to show that the switch was open on the empty track because of having been left latched by the night men, and that it had been left thus, up to the time deceased was injured. This leads us to inquire whose duty it was to see that that switch was unlatched, and in position for the day's work. It will be noticed that, when unlatched, the switch was closed, as to the empty track; and, when cars were run across onto the main track, it closed itself, after their passage. All that was required to set it for the day's work was to unlatch it, so that it would open and close with the passage of cars from the empty track. William Calvert, who had charge of the day men, testified, as to the duties of deceased, that, "If there was any such thing as a latch, unlatched, why, he was the man, but if there was anything broke he reported it." He further states as follows: "At 7 o'clock in the morning Johnson started from the bottom of the shaft, to grease it. He would take his can of oil, and start at the bottom of the shaft, and go to the end of the tunnel, and grease along, and see that everything was all right;" and that if a switch was open he would shut it. Also, that Johnson oiled the rollers, and kept the road clean, and that it was Johnson's business to take care of and repair the rollers, and that no man was kept at any of the four switches. Mr. Roberts, foreman, testified to Johnson's business as follows: "He attended to the switches, always, and greased the switches as he passed along in the morning. There is a plate under the point of the switch that the point runs on. He greased it as he passed along. Nobody looked after them, unless he reported them to me, and I would send a man to repair them." In answer to the question, "whose business was it to see that the switch was closed in the morning?" Mr. Roberts answered,

"It was Mr. Johnson's;" and in response to the further question, "was it anybody else's business?" he answered, "No." Gus Larson stated in his testimony that "Johnson had nothing to do with the switches. When the car ran through the switch, it would spring back." On further examination he stated that he never saw any one hook the switch up, and did not know whose business it was to do so if it was open. The statement that Johnson had nothing to do with the switch is explained by the further statement that the switch adjusted itself when the cars ran through, and is, therefore, no contradiction of the testimony showing that it was Johnson's duty to look after the switches. This testimony is also based upon the further statement that the witness never saw anyone hook the switch up, and did not know whose business it was to do so if it was open. The evidence, we think, shows, without conflict, that it was the duty of Johnson to see that this switch was in position in the morning for the passage of the first train of loaded cars on the main track from the face of the mine to the shaft; therefore, that the negligence which directly caused his death was his own, in failing to put the switch in its proper position. The evidence shows that deceased was an experienced miner; had been employed in that mine for one year and a half, and was familiar with the kind of switch, the manner in which it operated, the kind of place furnished him in which to work. That no man was kept at the switch. That it was frequently left open on the empty track by the night men, and that loaded cars were frequently shoved to the shaft without being attached to the train or cable. Having remained in the employ of the defendant, with all this knowledge, he must be taken, under familiar rules of the law, to have accepted the hazards incident to such condition of things; he not having made any complaint thereof, nor asked any changes or alterations with respect thereto. We think there was no error in ordering a verdict for the defendant. AFFIRMED.