J. S. McGLADE, Appellant, v. CITY OF WATERLOO et al.,
Appellees.

TRIAL:   Direction of Verdict—Rule to Determine—Survival of Jury
Question—Incontestable Facts—Negligence.   A jury question
made at the close of the testimony on behalf of him who alleges a
cause of action, ordinarily survives any amount of testimony on
behalf of the defendant. Defendant, in such case, cannot hope,
ordinarily, to do more than raise a conflict in the evidence. But,
as an exception to the rule, such jury question does not survive
a showing by defendant that it was built up and rests (a) on
testimony which is in conflict with incontestable facts (especially
physical facts), or (b) on testimony which, under the circum-
stances, cannot, in the very nature of things, be true, or (c) on
testimony which is entirely and wholly inconsistent with any other
theory than that the witnesses must have been mistaken. This is
but the rule to sustain a motion for a directed verdict whenever
a verdict for the party having the burden of proof could not be
sustained.

PRINCIPLE APPLIED:   A street car was moving eastward at
a non-dangerous rate of speed. Plaintiff was driving westward on
the north side of the same street with a single horse and buggy.
The horse gave no indication of fright until, coming to a hole
in the street, it momentarily hesitated, was gently touched with
the lines and told to ''get up,'' and thereupon suddenly lunged
and turned to the south and onto the street car track, and instantly
ran away to the east with the buggy. Plaintiff, in the sudden
cramping of the buggy, was thrown out and upon the track.
The oncoming street car could have been stopped within a dis-
tance of not less than 32 feet. It ran over plaintiff. In an
action for damages, plaintiff's evidence, at the close thereof, showed
that the car was from 50 to 60 feet distant from the horse when
it lunged upon the track. Defendant's testimony demonstrated
beyond question: (a) that the horse, in turning, struck his head
against the vestibule of the car; (b) that the buggy, in turning,
scraped the front end of the car; (c) that the short space in which
the horse turned was owing to the close proximity of the car;
(d) that plaintiff was not thrown in front of the car, but under
the car; (e) that the car was stopped within 16 feet after the
horse lunged. Held, a case where the jury question on defendant's
negligence did not survive defendant's evidence, and a verdict was
properly directed against plaintiff.

*Appeal from Black Hawk District Court.*—George W. Dunham, Judge.

Wednesday, March 8, 1916.

Rehearing Denied Saturday, September 30, 1916.

Action at law, to recover damages for injuries sustained by plaintiff, in a collision with a street car belonging to the Waterloo, Cedar Falls & Northern Railway Company, while being operated upon one of the streets of defendant city. The city was made a party, because it is claimed that the accident grew out of, or was caused, in part at least, by a defect in one of its streets, which it negligently failed to repair. Upon motion for a separate trial, the case was heard on issues tendered by the railway company, resulting in a directed verdict for the defendant, and plaintiff appeals.— *Affirmed.*

*Reed & Tuthill,* for appellant.

*Pickett, Swisher & Farwell,* for appellees

Deemer, J.—The accident happened upon one of the paved streets in defendant city, and grew out of the frightening of a horse (which plaintiff's brother was driving) at a hole in the paving, which was partially filled with water, causing the horse to shy, cramp the buggy to which the horse was attached, and throw plaintiff to the ground in front of the street car, which struck him, causing the injuries of which he complains. The negligence charged against the railway company was that, when plaintiff was thrown out of the buggy, he struck the ground somewhere near the rails of the track on which the car was running, something like 60 feet ahead of the car, and in plain sight of the motorman, and that the motorman saw, or should have seen, his peril, but that he carelessly and negligently failed

TRIAL: direction of verdict: rule to determine: survival of jury question: incontestable facts: negligence.

to stop his car in time to avoid the injury, which he might easily have done, had he exercised the care which the law required. Plaintiff also averred that, before he was thrown out, the horse gave signs of fright, and was acting in such a manner as should have led the motorman to believe that the plaintiff was in danger; and that, notwithstanding, he failed to stop his car, or to use other precautions against injury. It was also averred that the motorman failed to comply with the terms of a city ordinance with reference to stopping his car; but, as this ordinance added nothing to the duties which the common law imposed upon the motorman, it need not be considered. The defendant denied generally the allegations of negligence, and, at the conclusion of the testimony, and after each party had rested, the defendant moved for a verdict in its favor, and this motion was sustained. The only question presented by this appeal is the sufficiency of the testimony to take the case to a jury. And the real point of inquiry is whether or not there was enough testimony so that, had a verdict been returned for plaintiff, the trial court would not have been justified in setting the same aside, upon the record made.

We have repudiated the scintilla doctrine, and announced the rule that a trial judge should sustain a motion to direct whenever, considering all of the testimony, it clearly appears to him that it would be his duty to set aside a verdict if found in favor of the party upon whom the burden of proof rests. *Meyer & Bros. v. Houck*, 85 Iowa 319; *Hurd & Wilkinson v. Neilson*, 100 Iowa 555; *Cherry v. Des Moines Leader*, 114 Iowa 298, and cases cited.

Of course, this rule must not be so applied as to deprive the jury of its function to ascertain the facts, upon a fair dispute in the testimony, and the doctrine now generally applied is that if, at the conclusion of plaintiff's testimony, there is enough to take the case to a jury, a defendant cannot, after introducing his evidence, claim that there is nothing for a jury to determine. *Bever v. Spangler*, 93 Iowa 576–608;

*Phillips v. Phillips,* 93 Iowa 615; *McLeod v. Chicago & N. W. R. Co.,* 104 Iowa 139; *In re Betts' Estate,* 113 Iowa 111; *Gradert v. Chicago & N. W. R. Co.,* 109 Iowa 547. But there are some exceptions to this rule. For example, if the testimony offered by the party having the burden, is in conflict with undisputed facts, and especially with physical facts which are a verity, or is such that, under all the circumstances, it cannot, in the nature of things, be true, or is such as that it is entirely and wholly inconsistent with any other theory than that the witnesses must have been mistaken, the trial court is justified in directing, and it is its duty to direct, a verdict for the other party. *Artz v. Chicago, R. I. & P. R. Co.,* 34 Iowa 153; *Payne v. Chicago, R. I. & P. R. Co.,* 39 Iowa 523; *Bloomfield v. Burlington & W. R. Co.,* 74 Iowa 607.

Appellees' counsel, conceding that there is some testimony tending to support the charge of negligence, nevertheless contends that the case is one calling for the application of this last exception to the rule, and this brings us immediately to a consideration of that question, which is the only one involved. The car which it is claimed did the damage was not being run at a high or dangerous rate of speed, and it is practically conceded that it could have been stopped within a distance of not less than 32 feet; and it is said that it was, in fact, stopped within half that distance, after plaintiff's peril' was discovered. If, then, the car was not closer than 50 or 60 feet from plaintiff, where he was thrown onto the track, the question of the motorman's carelessness was for the jury. On the other hand, if he was within less than 35 or 40 feet from the car, the motorman, of necessity, having little time in which to turn off his current and to apply his brakes, there would be no liability on the part of the company. Now the testimony shows that the horse was a gentle one, not easily frightened; that he gave no evidence of being frightened, until he came up to the hole in the street, and did nothing then until the driver spoke to him, and slapped him with the lines, when he immediately shied, lunged

toward the street car track, cramped the buggy, and threw the occupants out.  At this time, plaintiff was traveling westward along Independence Avenue, and the street car was going in the opposite direction.  The two were approaching each other, and the accident occurred nearly opposite Beech Street, a side street leading into Independence Avenue from the north.  Just before the accident occurred, plaintiff was being driven at a slow jog trot along the north side of Independence Avenue, about half way between the north rail of the railway and the curbing on the north side of the avenue, and his horse had come almost to the hole in the pavement,— which hole was a little westward of the center of Beech Street, had it been extended into the avenue,—when it shied at the hole, turned its head to the southward, threw the occupants out of the buggy, and, having completely turned around in front of the car, ran away toward the east.  With this statement, we shall now be better able to understand the testimony.  We quote the following from the testimony of plaintiff's brother, who was in the buggy with him:

"The horse looked at the hole and wanted to stop.  I said 'get up' to the horse a couple of times and hit him on the back with the lines 'a little bit.  Q.  Then what did he do?  A. Started to go across and made a lunge. . ., . He did not want to go.  He wanted to stop, and he kind of stopped and I patted him a couple of times and said, 'Get up, Joe,' and he started, and at that he made a lunge or shy, whatever you call it. . . . Q.  Then when you said, 'Get up, Joe,' you cracked him over the back with the lines; you say he then shied and turned suddenly towards the left?  A.  Yes, sir. Q.  I suppose this all happened almost in a flash, didn't it, Jim?  A.  Didn't take long.  Q.  Just one of those accidents that happen just about quicker than you can tell it, wasn't it?  A.  Yes, sir.  Q.  The horse turned toward the street railway tracks?  A.  Yes, sir.  Q.  As I understand you, the horse had shown no symptoms of fright until he made this sudden lunge?  A.  No, sir. . . . He (horse) might have

stopped a second—might be two seconds or three seconds, wasn't very long,—I couldn't say,—just a short time. . . . Q. You were driving along there and the horse kind of slackened its speed and kind of looked towards the hole and then all of a sudden made this lunge? A. Shied or lunged, whatever you call it. Q. As a matter of fact, he didn't come to any particular stop, nor there wasn't any perceptible amount of time that he paused? A. He kind of stopped and looked at it and I hit him with the lines. Q. It was all done instantaneously, in a flash? A. It wasn't very long. . . . Q. When your horse became frightened and turned toward the track, where was the car? How far away? A. I do not know. Somewhere around 40 or 50 or 60 feet, tc the best of my recollection.''

On cross-examination, he said:

''Q. Did you pay any attention to where it was when the horse made this sudden shy and lunge and turned? A. I know it was somewhere around the center of the block. Q. But you could not tell where it was or how far it was away, could you, Jim? A. It might have been 50 feet and it might have been 60 feet. I could not say for sure. It was this side of the center. Q. It was somewhere between this side of the center between Beech and Vinton streets? A. Yes, sir. Q. But you would not undertake to say how far it was away? A. No. Somewhere between 50 or 60 feet. . . . Q. When you first saw the car as you approached Beech street, it was about half way between Beech street and Vinton street? A. About half way. Q. Then you drove into Beech street, and you wasn't paying any attention to where the car was, because you didn't have any occasion to? A. No, sir. . . . Q. I asked you the question where you were when you saw the car about the center of the street between Beech and Vinton, and you said you were approaching the intersection of Beech street, didn't you? A. Yes, sir, I was close to Beech street. Q. And you said the car was then about the center of the block between Beech and Vinton? A. When

I first noticed it.  Q.  As you were coming down the street?
A.  Yes, sir.   After I saw the car at this place, I entered
Beech street and continued along about the gait I have described until I came to the hole.  I don't know whether I
drove 5 feet, 10 feet, or how far it was, but I kept driving
right along, and the car was coming also.  Q.  You weren't
trying to think how far away the car was at that time, were
you?  A.  No, sir.  Q.  And you wouldn't undertake to say
how far it was away?  A.  It was about the center of the
block.  Q.  It was about the center of the block when you were
approaching Beech street,—that is what you said?  A.  Yes,
sir.  Q.  After you had entered Beech street and got to the
hole and the horse made this sudden shy and turn and lunge
in the direction of the car track, you didn't pay any attention
then to what distance the car was, or where the car was?
A.  No, sir, I was looking out for ourselves.  Q.  And you
wouldn't undertake to say where the car was at that particular time?  A.  No, it might have been 50 or 60 feet, or
where it was—  Q.  But you are guessing when you say it is
50 or 60 feet away?  A.  It might be that, I said, 50 or 60
feet, or more or less.  Q.  Well, it might have been a thousand
miles away, too?  A.  Yes, but hardly.  Q.  You don't undertake to say where it was at that time?  A.  I told you two
or three times I didn't.  Q.  And you didn't notice where
it was at that time, did you?  A.  I told you two or three
times I didn't.  Q.  Well, if you didn't notice where
it was, then you couldn't undertake to say whether it was 50
or 60 feet or 10 feet away, could you?  A.  I told you two or
three times I couldn't.  Q.  That is all I want then, that is
enough.''

Plaintiff himself testified:

''Q.  What did the horse do when he came to this hole
with the water in it?  A.  He stopped about a second, shied
off to one side and whirled toward the street car track. . . .
He kind of stopped for a second or fraction of a second and

kind of shied a little bit, made a quick whirl suddenly. Did not have time to do anything or think of anything much. Q. The horse didn't have to go very far, just a matter of a few feet, to make the turn? A. A few feet, yes, sir. . . . Q. There wasn't any time intervening between the looking and shying? A. No. Q. As the horse turned toward the street car track, did you notice the street car? A. Yes, sir. Q. How far was the street car away at the time? A. It was, about half way at that time. Q. Half way to what? A. The next street below, somewhere from 60 to 75 feet, I should judge. . . . Q. How far were you driving from the curb line when the horse made this lunge. A. About the center of the street. That is, with reference to the curb and the street car track. About that. Would be about 14 or 15 feet from the curb to the track. Ordinary buggy, about 4 or 4½ feet wide. Q. He turned toward the track? A. He whirled right around. Q. The horse didn't have to go very far, just a matter of a few feet, to make the turn? A. A few feet, yes, sir. Q. And in this sudden turn around you were thrown out? A. Thrown out. Q. So, at that time, you could not say where the car was or how fast it was going? A. When horse was making that turn? Q. Yes, sir. A. Certainly, it was about half way down the block.''

Such is the testimony for plaintiff, and, ordinarily, it would be sufficient to take the case to a jury, although there are some inconsistencies therein. But appellees' counsel contend that the undisputed testimony and the physical facts are such that this testimony cannot possibly be true. They insist that the thills of the buggy struck and left their marks on the car; that the horse turned in a short space and cramped the buggy because of the immediate presence of the car; that the buggy itself came in contact with the car, and left its mark thereon, and that, as a matter of fact, plaintiff was thrown out rather under than in front of the car; that the horse's head, in turning, came into the window of the vestibule of the car, and that the car, in fact, struck him, although

going at a slow rate of speed, and that the, car was stopped within half its length after the horse started to turn across the track.

Without setting out the testimony at length, we are constrained to hold that these claims are established without dispute, and that plaintiff's story as to how the matter occurred cannot be squared with these physical and undisputed facts—this not being due to any intentional misstatement, but to the excitement of the moment, and the natural desire that every man has to shield himself from blame. Indeed, both plaintiff and his brother testified, on rebuttal, that they would not swear that the thills or buggy did not strike the car, and they could not swear whether they did or not. Of course, if they were away from the car the distance claimed on their original examination, they could and should have sworn that they did not and could not strike the car. We must, also, give some effect to the finding of the trial court, who had the advantage of seeing and hearing the witnesses. We do not wish to assume the functions of a jury, or to trench on its province; but the trial court has a duty in the premises, and our duty is to correct that ruling, if error be made. No such error appears here, and the judgment must be, and it is,—*Affirmed.*

EVANS, C. J., WEAVER and PRESTON, JJ., concur.