MRS. EARL POTTER, Administratrix, Appellant, v. CECIL A. ROBINSON, Appellee.

No. 46117.

480

Uhlenhopp & Uhlenhopp, of Hampton, for appellant.

Shumway & Kelly, of Algona, and Putnam, Putnam, Fillmore & Putnam, of Des Moines, for appellee.

MILLER, J.— Plaintiff's petition asserts that her decedent was operating a Model-A Ford coach in a southerly direction on the west half of the paved portion of Highway U. S. 169 about five miles north of Algona, on a curve approaching the crest of a hill, when same was struck by defendant's truck which was proceeding north on said highway; as a result of the collision, her decedent was fatally injured; decedent was not negligent; the driver of defendant's truck was negligent in operating same at excessive speed, failing to maintain proper lookout, failing to have the truck under control, violating the assured-clear-distance rule, failing to yield one half the traveled portion of the highway. Plaintiff demanded judgment for $10,000. The answer was a general denial. At the close of the evidence the court directed a verdict for defendant. Judgment was entered accordingly. Plaintiff appeals.

Plaintiff makes two assignments of error: first, that the court erred in directing a verdict; second, that the court erred in sustaining objections to testimony of the witness Pankuk.

In support of the first error assigned, plaintiff asserts three propositions: 1. The jury could reasonably believe plaintiff's witnesses and find from the circumstances related by them that defendant is liable. 2. The jury had a right to find defendant liable upon defendant's admission that his driver was on the wrong side of the road. 3. The circumstantial evidence in this

case, taken with defendant's admission that his driver was on the wrong side, made a case for the jury.

Defendant challenges the sufficiency of the assignment of error to meet the requirements of Rule 30. Numerous decisions of this court are cited. In some of them are statements that support defendant's contention. This court, as now constituted, is reluctant to enforce the rule as strictly as has been done in some of our former decisions. We prefer to extend to all litigants a hearing on the merits if at all possible. Accordingly, we have carefully examined the record herein for the purpose of determining whether or not the trial court was right in finding that, "if this matter were submitted to the jury and the jury should return a verdict for the plaintiff, it would be the duty of the court to set the same aside." After careful deliberation, we are disposed to agree with the trial court.

This accident occurred about 12:30 or 1 a. m., September 1, 1940, on Highway U. S. 169, about five miles north of Algona. Defendant owned the first and third of three trucks which were returning from a trip to Tama. The trucks were proceeding north. The first truck was an International with a Fruehauf trailer, operated by Allan Robinson, who was alone in the cab. The second truck, a Ford V-8, was operated by William Weir, the owner of the cattle that had been taken to Tama, with whom Glenn Reece was riding. The third truck was operated by defendant, Cecil Robinson, with whom Adam Wilhelmi, a son-in-law of Reece, was riding. Weir's truck was about 300 feet behind the first truck, and defendant was 900 to 1,000 feet behind it. Plaintiff's decedent was operating a Model-A Ford coach. George Lavin was riding with him, but did not testify. The only eye-witnesses to the tragedy who testified were members of defendant's party. Plaintiff concedes that the testimony of such witnesses would warrant a verdict for defendant but contends that the circumstantial evidence of her witnesses and the testimony of admissions by defendant present sufficient conflicts in the evidence to require a submission of the cause to the jury.

This collision involves two vehicles proceeding in opposite directions on the same highway. The crux of the case is, Which vehicle was on the wrong side of the road at the time of impact?

If defendant's truck was at that time on its right-hand side, the east side of the highway, plaintiff's action was rightly dismissed. The evidence on this issue determines whether or not a jury question was presented.

We have held repeatedly that where the evidence is such that, should the jury return a verdict for the plaintiff it would be the duty of the court to set the same aside, defendant's motion for a directed verdict should be sustained. Scott v. Hansen, 228 Iowa 37, 42, 289 N. W. 710; Bowermaster v. Universal Prod. Co., 221 Iowa 831, 835, 266 N. W. 503; In re Estate of Work, 212 Iowa 31, 37, 233 N. W. 28; Schmidt v. Hayden, 205 Iowa 1369, 1371, 219 N. W. 399; First Nat. Bk. v. Brown, 197 Iowa 1376, 1378, 199 N. W. 272; McGlade v. City of Waterloo, 178 Iowa 11, 13, 156 N. W. 680; Cherry v. Des Moines Leader, 114 Iowa 298, 305, 86 N. W. 323, 54 L. R. A. 855, 89 Am. St. Rep. 365; Hurd & Wilkinson v. Neilson, 100 Iowa 555, 557, 69 N. W. 867; Beckman v. Consolidation Coal Co., 90 Iowa 252, 255, 57 N. W. 889; Meyer v. Houck, 85 Iowa 319, 327, 52 N. W. 235; Bothwell v. C., M. & St. P. R. Co., 59 Iowa 192, 194, 13 N. W. 78; Starry v. Dubuque & S. W. R. Co., 51 Iowa 419, 422, 1 N. W. 605. As a part of this rule of law, we have held that whenever, considering *all* the evidence, it clearly appears to the trial court that it would be its duty to set aside a verdict if found in favor of the party upon whom the burden of proof rests, then a motion to direct a verdict against such party should be sustained. Scott v. Hansen, supra; McGlade v. Waterloo, supra. Accordingly, we will undertake to analyze *all* the evidence bearing on the question where the impact between the vehicles occurred.

Allan Robinson, the driver of the truck, testified he was on the right or the east side of the pavement; as he approached the place of the accident he saw the Ford car when it was approximately 100 feet ahead of him coming toward him without any lights, with its left wheels well over the black center line on the east side of the pavement; he pulled the truck to the right in an effort to avoid the collision, going out onto the right shoulder; the Ford car struck his left front wheel, bending the wheel back so that he could not control the truck, and after the collision the truck, with the left wheel bent back, curved to the left across the

pavement and into the ditch on the west side of the road; the Ford also settled down on the west side of the road about 70 to 90 feet south of the truck; the truck did not turn over; after the accident he looked over the marks on the pavement and found glass and dirt on the east side of the pavement and black smudges that led from the Ford car across the center of the pavement up to where all the dirt and glass were on the east side.

William Weir was operating a truck behind Allan. He testified that he first saw the Ford car when it was about five feet ahead of Allan as he then saw the reflection of Allan's lights in the Ford's reflectors; there were absolutely no lighted headlights or lights of any kind on the Ford and it was straddling the middle line of the pavement; he examined the marks after the accident, with a flashlight, and observed the pile of dirt and glass on the east side of the center line and the marks and tracks leading back from the truck across the center line to the east side and the marks leading back from where the Ford car stopped after the accident across the center line of the pavement to the east side.

Glenn Reece testified that he was riding with Weir, but was asleep at the time of the accident; he got out of the truck with Weir and examined the pavement with a flashlight; he observed that most of the dirt and glass was on the east side of the pavement between the black line and the shoulder; the tracks led back from the rear wheels of the truck across the pavement to the east side; these marks showed the tread of the tire and ran through the patch of dirt on the east side of the highway; where these tracks crossed the center line of the highway the tar was burned as if the wheel had been sliding; there was a black mark from the left rear wheel of the Ford car that traveled eastward to the center line and across it and then went north parallel to the center line; this mark from the left rear wheel would be 18 to 24 inches east of the center line of the pavement.

After the accident Weir went to the farm of Robert Leason for help and Leason came to the scene of the accident. He testified that some dirt and the bulk of the glass were on the east side of the pavement from one to two feet of the center of the pavement; he saw dark marks that looked like burned-rubber

tracks extending from the back end of the truck· clear over to the east side of the pavement.

Arthur Cogsley, the deputy sheriff who rode to the scene of the accident in the ambulance, testified that he observed the dirt that had been knocked off the Ford car and the truck about two and one-half feet east of the center of the pavement; you could trace the truck tracks from where it was standing back across the pavement and across the center line to this pile of dirt, with the right truck tracks leading out on the east shoulder.

Casey Loss, the sheriff, arrived after his deputy, made an investigation, observed that the bulk of the glass was on the east side, saw the pile of dirt in the east traffic lane, observed the tire marks leading from the back end of the truck across the pavement into the east line to the patch of dirt, debris, and glass; skid marks led back from the Ford car onto the pavement extending across the center line to the patch of dirt and debris.

N. E. Kohnke, a medical student at Iowa University, arrived at the scene of the accident and administered first aid to Lavin. Lavin told him that he had been asleep and admitted that he had been drinking. Kohnke observed the patch of dirt and glass two or three feet east of the center line of the pavement, the black skid marks leading from the Ford car back to the pile of dirt on the east side, and the burned-tire marks extending from the rear of the truck, from each wheel, back across the pavement onto the east side with the right wheel mark leading out on the east shoulder.

J. E. Saunders, a college student riding with Kohnke, testified that he, too, saw the tracks running from the truck across the pavement and across the black line on the east side of the pavement; the bulk of dirt and glass was on the east side of the pavement; tire burns ran back from the Ford car to the east side of the pavement, one on each side of the black line.

Defendant testified he did not see the accident; the last time he saw Allan's truck was when the truck was 1,500 feet south of the point of the collision; he first learned of the accident when Weir pulled off on the shoulder and stopped; he stopped just ahead of Weir and Weir told him there had been an accident; he made an investigation and found the truck tracks extending

back from the truck across the pavement to the pile of dirt and glass on the east side and the smudge marks extending from the Ford car with the left smudge mark extending across the center line of the highway.

Defendant's passenger, Adam Wilhelmi, got out of the truck when defendant stopped, took a flashlight and examined the scene of the collision; most of the dirt and glass was lying on the east side of the pavement; tracks led from the rear of the truck across the pavement to the east side of this patch of dirt and glass; the burned-tire marks led back from the Ford car on each side of the center line.

Otto Baranthin, the city policeman in Bancroft, testified he had stopped Potter, the driver of the Ford, in Bancroft that evening between 9 and 10 o'clock for driving without lights. He had stopped him two or three times before for driving without lights within the previous three-weeks' period and Potter had promised to get the lights fixed.

Photographs of the scene of the accident, taken about 6 o'clock the next morning, were introduced in evidence without objection. They showed the marks on the pavement with the smudge marks on the black lines of the pavement showing up quite clearly. Most of the foregoing witnesses used these photographs in connection with their testimony.

To show that the truck was on the left or west side of the highway at the time of the collision and that the lights on the Ford were lit at the time of the accident, the plaintiff introduced the following testimony:

Everett Pankuk arrived with his wife and child after the flares had been put out. He testified that the glass he saw was all on the west side of the pavement, but maybe there were a few little scattered pieces on the east; he did not see the dirt and glass on the east side of the pavement, but he would not say there was not any there; he saw "marks on the pavement that looked like somebody had put on a brake and let a tire slide. These marks started from where the glass started on the north end and ran off to the west—off of the pavement to where the truck was." He did not have a flashlight and he did not look around much that night. The trial court sustained objections to the offer of testi-

mony of this witness with regard to marks he observed the next morning.

Mrs. Pankuk testified that she did not need a flashlight, but with respect to the tracks on the highway she testified as follows:

"Q. The court says you may describe those tracks that you mentioned? A. I would say they looked as though they had skidded, but *as to where they were I didn't take notice.* They were on the west side of the pavement. *Otherwise I don't know.* * * * A. I *don't* say anything about the tracks, only that I had seen them. They were—I. don't know—It looked as though they were—You couldn't see any track, but just those."

Marjorie Pankuk, the twelve-and-a-half-year-old daughter of the Pankuks', did not testify with regard to the tracks. She at first said there was broken glass on the east side of the pavement, and then corrected herself and said, "I mean the west side."

Earl Potter, the father of the deceased driver of the Ford car, did not arrive at the scene of the accident until 8 or 9 o'clock the next morning. He saw glass on the west side of the pavement and scratches on the west side of the pavement that looked fresh; he examined the Ford there and examined the lighting system, and, although the headlights had been broken off, the rest of the lighting system was in perfect condition and the switch was turned on. He testified to an admission made by defendant a week after. the accident that the lights on the Ford were lit, which admission defendant denied.

V. A. Mettler, a lawyer and justice of the peace at Mason City, testified that Potter, the father of the driver of the Ford car, came to him the morning after the accident and asked him to go and see if he could find out whether the boy was in the right or wrong, but that he, Mettler, was not retained as a lawyer. Mettler testified that more than a year after the accident, and about a month before the trial, he went out to defendant's farm where defendant was baling straw all alone, and there defendant admitted to him that the Potter boy had lights; that the Lavin boy was asleep when the accident happened, and that "Junie [Allan Robinson] got on the wrong side

of the road on that curve and ran into the Ford.'' Mettler further stated that although he was not an attorney in the case, he expected to be paid for his trips. Defendant denied making the admissions testified to by Mettler.

The foregoing is practically all the evidence bearing upon the position of the truck at the time of the collision. With such a record we do not believe it would be proper to allow the jury to speculate on where the accident occurred. The eye-witnesses and the many witnesses who testified about the truck tracks, including the disinterested witnesses and the law-enforcing officers who conducted an investigation shortly after the accident, and the photographs, definitely establish the fact that the collision took place while the truck was on the right or east side of the pavement. The testimony of the Pankuks to the effect that they saw tracks on the west side does not raise a conflict, because they did not say that there were no marks on the east side. All the testimony showed there were tracks on the west side, but the witnesses other than the Pankuks all testified that the truck tracks extended from where the truck was after the accident back over the west side to the east side of the pavement.

This semitrailer truck with dual wheels would most certainly leave a trail that could be retraced on the pavement slab. Such a trail so unanimously observed by all who investigated immediately after the accident leaves no substantial evidence upon which the jury could arrive at a verdict for the plaintiff by concluding that the truck was on the left at the time of the collision. Such evidence of tracks rises to the height of foot-print testimony when properly connected up with the vehicle. It would take more than the uncertain and equivocal testimony of the Pankuks to raise a fair conflict which would warrant the jury in finding the truck was on the left-hand side of the highway at the time of the collision. Compare Reimer v. Musel, 217 Iowa 377, 251 N. W. 863.

There remains the question of the admission to the attorney Mettler. This admission was made more than a year after the accident and about a month before the trial to the attorney who was first consulted by the plaintiff Potter. De-

488

fendant denies the admission and the undisputed evidence shows that he was 900 to 1,000 feet south of the point of the accident when it occurred; he first learned of the accident when he talked to Weir after Weir had stopped on the shoulder of the highway. The testimony shows that defendant was in the vicinity of the Black Cat bridge at the time of the collision, which was down a curving hill and approximately 1,000 feet south of the point of the accident. Such testimony is not sufficient upon which to rest a verdict for the plaintiff. In an early Iowa case, Epps v. Dickerson, 35 Iowa 301, this court with respect to testimony of alleged conversations, refused to grant relief upon such testimony. It is true that that is an equity case, but it is significant that the case was cited and commented upon in the case of Jones v. Harris, 122 Wash. 69, 75, 210 P. 22, 24. In this latter case, a verdict for a plaintiff in an automobile-accident case was predicated upon admission testimony. The plaintiff had shown that the owner of the car had on occasion admitted his son had general permission to use the car and admitted that he was a reckless driver. In setting aside the verdict for the plaintiff the court quoted from an earlier Washington case to the effect that admissions alone were insufficient to carry a case to the jury, and stated:

"When uncorroborated by any supporting circumstance, it has ever been regarded as the weakest, most unsatisfactory and most dangerous of all the various kinds of evidence."

A review of a number of other cases is contained in this opinion. The court quoted from our decision and stated (at page 79 of 122 Wash., page 25 of 210 P.):

"In the language of the Iowa court, the testimony in 'its very completeness and perfect fitting to the plaintiff's case is [in] itself a just ground of suspicion.'"

Here it will be observed that the location of this collision, as disclosed by the testimony of the admission, is not supported by the testimony as a whole and it is definitely refuted by the photographs. It would be insufficient to support a verdict when we consider defendant could not have seen the accident from the place where he was when the collision occurred. Such testi-

mony of an admission made so long after the accident occurred, to one who was at least consulted as an attorney for the plaintiff in the earliest stage of this litigation, is too weak and unsatisfactory when the record shows that the admission is denied and it corroborates no other testimony upon which a verdict for the plaintiff could be supported.

The situation herein is analogous to that present in the case of Bowermaster v. Universal Prod. Co., supra, wherein we state, at page 835 of 221 Iowa, page 505 of 266 N. W., as follows:

"First referring to the claim that defendant made a statement that he did not see the truck until he hit it, a careful reading of the record and the established facts would in our opinion lead all reasonable minds to conclude that such testimony was without probative substance and the witness mistaken. The point to such testimony would of course be to establish that Barns was oblivious to the surroundings and was keeping no lookout ahead, as bearing on the question of recklessness. However, such proposition is so entirely negatived by the established facts and circumstances that a verdict could not be sustained which depended on such testimony. Meyer & Bros. v. Houck, 85 Iowa 319, 52 N. W. 235; In re Estate of Work, 212 Iowa 31, 233 N. W. 28."

We do not mean to imply that testimony of an admission would in no case be sufficient to sustain a verdict. An undenied admission might be strong evidence and admissions made as a part of the res gestae, even though denied, might raise a fair conflict in the testimony. It is the character of the admission herein, considered with the overwhelming evidence to the contrary, which renders it weak and ineffective. It was competent evidence but it is insufficient to avoid application of the scintilla-of-evidence rule herein.

In all cases where this court has applied the scintilla-of-evidence rule or physical-facts rule, there has been some conflict in the evidence. In each case the evidence that produced the conflict was held to be so unreasonable or inconsistent with clearly established facts that it was not of sufficient probative substance to sustain a verdict. The application of the rule de-

pends in large part upon the facts of each particular case. As above pointed out, we have repeatedly applied the rule that, if, upon a motion for new trial, it would be the duty of the court to set a verdict aside, it is the province of the court to direct a verdict and not submit the cause to the jury. We are satisfied that, under the record herein, had the court submitted this cause to the jury and it had returned a verdict for plaintiff, it would be the duty of the court to set the same aside. Accordingly, the ruling on the motion to direct a verdict was right. The trial court has some discretion in such a case. There was no such abuse of discretion herein which would warrant or require a reversal.

The other error assigned challenges the ruling on an offer of proof as to the witness Pankuk. The testimony offered was similar to some of that given by plaintiff's husband. By reason of what we have heretofore said, the testimony, if admitted, would not be of sufficient probative value to affect the result. Accordingly, the ruling was not prejudicial.

The judgment is—Affirmed.

HALE, WENNERSTRUM, MANTZ, MULRONEY, and SMITH, JJ., concur.

GARFIELD, C. J., and BLISS and OLIVER, JJ., dissent.

GARFIELD, C. J. (dissenting)—I respectfully dissent. I think the trial court's ruling was a clear invasion of the province of the jury.

I do not care to review the evidence in detail. The majority have summarized much of it but in a way that is favorable to defendant. Mr. and Mrs. Pankuk and decedent's father, especially, gave substantial testimony favorable to plaintiff that is not mentioned in the opinion, although it purports to summarize "practically all the evidence bearing upon the position of the truck at the time of the collision." Suffice to say that four witnesses, the three Pankuks and decedent's father, testified to circumstances and physical facts indicating that the collision occurred, contrary to defendant's contention, west of the center line.

It was shown that broken glass, damaged parts, and debris were found on the west side of the pavement *and none on the east,* leading to the Ford car on the west shoulder; the four witnesses testified the broken glass was all on the west side; the bodies of the men, the Ford, and the truck were all on the west side; scratches, skid marks, car and truck tracks were seen on the west half of the pavement, and holes in the west shoulder. Decedent's father testified that defendant admitted decedent's lights were on and that he (defendant) *saw the accident.* An attorney justice of the peace swore that defendant told him decedent had lights and that defendant's driver ''got on the wrong side of the road on that curve and ran into the Ford.'' (The majority say this witness testified, ''he expected to be paid for his trips.'' He did say, ''I expect to be paid for my trips *over here,*'' meaning, I assume, his witness fees and mileage.) All the above testimony sharply conflicts with that of defendant's witnesses.

If plaintiff's witnesses were telling the truth, this collision occurred west of the center of the highway, and consequently the case was for the jury. The majority say, ''The crux of the case is, Which vehicle was on the wrong side of the road at the time of impact?'' Apparently, the verdict was directed because the trial court thought plaintiff's witnesses were not telling the truth. The majority seem to be of the same opinion. But it was for the jury, not for the trial court nor this court, to say who was telling the truth.

I specially dissent from the majority holding that, although it was competent, there is no probative value in the testimony regarding admissions of defendant on the theory that he ''could not have seen the accident from the place where he was when the collision occurred.'' I do not agree that defendant could not have seen the collision. The jury might well have found he was in position to see it. In any event, defendant was following the other two trucks, arrived at the scene of the collision within a few moments, made an investigation, talked with some of the witnesses and doubtless with his nephew-employee. His admissions tended to establish liability and clearly have probative value.

In Read v. Reppert, 194 Iowa 620, 623, 190 N. W. 32, we held that a defendant's admission that his car was probably being

driven in a reckless manner was entitled to be considered, even though the defendant did not see the accident, had no knowledge gained by observation as to how the car was driven, and the testimony was denied. The majority in effect overrule Read v. Reppert, which is in line with numerous other authorities. See, also, Melton v. Royal Highlanders, 194 Iowa 352, 359, 189 N. W. 787; Salvitti v. Throppe, 343 Pa. 642, 23 A. 2d 445, 138 A.L.R. 842, and annotation 845; 31 C. J. S. 1025, 1026, 1027, section 272b, note 66; 20 Am. Jur. 460, 461, section 544, note 18; IV Wigmore on Evidence, 3d Ed. (1940), 12, section 1053; 1 Jones on Evidence, Civil Cases, 4th Ed. (1938), 556, 557, section 296; 2 Chamberlayne Modern Law of Evidence, 1657, section 1305; 2 Ford on Evidence (1935), 903, section 172; 3 Jones Commentaries on Evidence, 2d Ed. 1972, section 1071; McKelvey on Evidence, 4th Ed. (1932), 133, section 75.

To hold under this record that decedent was guilty of contributory negligence as a matter of law or that there was no substantial evidence of defendant's negligence involves a misconception of the true functions of judge and jury. Hawkins v. Burton, 225 Iowa 707, 281 N. W. 342, and Cerny v. Secor, 211 Iowa 1232, 234 N. W. 193, tend to support the conclusion that the case was for the jury.

I would reverse.

BLISS and OLIVER, JJ., join in this dissent.