PEARL F. SEARS ET AL., APPELLEES AND CROSS-APPELLANTS, v. MID-CITY MOTORS, INC., A CORPORATION, APPELLANT AND CROSS-APPELLEE, IMPLEADED WITH SAMUEL I. ROTHENBERG ET AL., A COPARTNERSHIP, DOING BUSINESS AS SERVICE JUNK COMPANY, APPELLEES AND CROSS-APPELLEES.

132 N. W. 2d 361

Filed January 22, 1965.   No. 35683.

Abrahams, Kaslow, Story & Cassman and Robert C. Oberbillig, for appellant.

Gross, Welch, Vinardi, Kauffman & Schatz and Haney, Walsh & Wall, for appellees Sears et al.

Cassem, Tierney, Adams & Henatsch, for appellees Rothenberg et al.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

BROWER, J.

This action was commenced by the plaintiffs, Pearl F. Sears and Ruth F. Burke, in the district court for Douglas County, Nebraska, to recover damages incurred in a fire which burned a building owned by them. The defendants in the action were Mid-City Motors, Inc., a corporation, lessee of the building, and Samuel I. Rothenberg and Jack Levey, a copartnership, doing business as Service Junk Company.

The plaintiffs will be so designated. The defendants will be referred to as Mid-City Motors and Service Junk Company, respectively.

The plaintiffs alleged that Mid-City Motors was liable because of negligence in the operation of an acetylene torch used in cutting pipes and fittings in a sprinkling system which was in the process of being removed from the premises. The acts of negligence which were in the plaintiffs' petition alleged to be the proximate cause of the fire and which were said to be joint and concurring negligence of both defendants may be stated as follows: In utilizing an acetylene torch in close proximity to the

false ceiling and failing to take precautions to prevent the flame, fire, and sparks from coming in contact therewith; in failing to inspect the area where the torch was used to determine whether or not it was safe to use the same and in using said torch in close proximity to said ceiling when the same was inflammable; and in failing to properly use hacksaws or other nonflammable cutting devices or to properly supervise the efforts of the workmen. It is alleged the Service Junk Company was the agent, servant, and employee of Mid-City Motors which had charge and exercised control and supervision over its action. Defendants each answered separately and for the purposes of this opinion the answers may be treated as general denials.

At the time of the fire, defendant's name was Meeks Rent-A-Car Company, a corporation, but its name had been changed to Mid-City Motors prior to the filing of the petition. At times it will be designated as its name was before the fire but in any event it is one and the same.

The matter was tried in the district court before a jury. At the conclusion of all the evidence, the court sustained a motion made by Service Junk Company for a directed verdict and it was dismissed from the action. The court overruled a similar motion on behalf of Mid-City Motors and submitted the action to the jury as to it. A verdict was returned for the plaintiffs in an amount stipulated to be the damage in case the defendants were found liable therefor.

The defendant Mid-City Motors filed a motion for judgment notwithstanding the verdict or for a new trial, and the plaintiffs filed a motion for a new trial assigning error to the court in sustaining the motion of Service Junk Company for directed verdict and dismissal. Both motions being overruled, the defendant Mid-City Motors has brought the matter to this court on appeal. The plaintiffs-appellees have cross-appealed both from the order dismissing the action against Service Junk Com-

pany and as to certain rulings of the court on the admission of evidence.

The defendant and appellant Mid-City Motors assigns as error to the trial court the overruling of its motion for a directed verdict or dismissal at the close of the plaintiffs' evidence, renewed at the close of all the evidence, and from the order overruling its motion for judgment notwithstanding the verdict or for a new trial.

The plaintiffs as cross-appellants assign error to the court in finding the evidence insufficient to submit to the jury the question of liability of the defendant Service Junk Company, and the defendant Mid-City Motors contends the trial court erred in submitting the cause against it to the jury. Therefore, we will first outline the evidence as it affects the cause of action the plaintiffs assert against both of said defendants.

The business of Mid-City Motors consisted of renting cars and trucks for the use of others, storage of those belonging to others, and washing and repairing cars of its own and for others.

The fire which caused the damage which was involved in this litigation was discovered a little after 1:30 on the morning of January 10, 1959. The building of the defendant Mid-City Motors in which it occurred is located at the southeast corner of the intersection of Sixteenth and Leavenworth Streets in the city of Omaha. It is a brick building 120 feet square with numerous frame partitions therein. Where it is located apparently the ground slopes rapidly to the south and there is a viaduct on the portion of Sixteenth Street used by the public to its west. Although it is a three-story building the top floor is even with Leavenworth Street on the north and is on an approximate level with the viaduct on the west. The lower floors are to the east of this viaduct and below it but can be reached by the roadway leading down to it from the west. The fire in question occurred on the top floor and apparently any damage to the lower floors was occasioned only by water

used in fighting it. This floor is designated generally in the evidence as the top floor and will be so designated herein although with respect to both Leavenworth Street and the viaduct to the west it is the ground floor.

A considerable portion of the two lower floors and a small portion of the top one were occupied by other businesses. The lowest of the floors was used for storage of cars or trucks. The company had some cars for use of customers called U-Drive Cars, using generally 20 in the summertime and 14 in the winter.

At the northwest corner of the building, the top floor had a diagonal front facing the intersection of both streets. On this front was a large overhead door for the entrance of cars and trucks which was operated electrically from the office located on Leavenworth Street to the north on the top floor. A smaller door northeast of it opened into the office. Another small door to the south and west opened into the small portion of the top floor occupied by another business from which a door opened into the remainder of the top floor used by Mid-City Motors and referred to at times as the garage. The garage floor was of cement. The walls were of brick or concrete except the office where they were wood. The garage was separated from the office by a frame partition in which there were glass windows looking into the service area so that those in the office might supervise the operation of the garage. There was a ramp on the top floor leading to the washroom and car repair shop on the second floor and there was also some space on that floor for company trucks. On the second floor there was a heater for heating water for washing cars and a gas furnace for heating the building. There were also automatic gas heaters. Gasoline pumps were outside and inside the building on the top floor. There were storage facilities for cars and trucks on both floors and there were some 30 cars belonging to others in the building of which a considerable number were on the top floor on the night of the fire. The garage had fluorescent

lights, some drop cords in the shop washroom, and a skylight. On a balcony on the top floor reached by a hanging stairway were stored automobile tires, chains, and other articles.

On the top floor were rows of cement pillars which were 20 feet apart east and west and 16 feet apart north and south. They supported cement beams which ran east and west on the top of these rows of pillars, the beams being about 18 inches square. On the top of these beams were "rafters" to which the false ceiling composed of a celotex substance was nailed. The ceiling was 12 to 14 feet high. These beams also supported a wood and rubberoid roof above, although exactly how does not appear in the record. The roof slanted and in places there was room to stand between the roof and ceiling, and in other places the crawl space between was slight. The evidence fails to show what, if anything, was contained in this space.

In about the center of the top floor was a skylight 40 feet long east and west and 16 feet wide with a gabled roof, the upper portion of which was all glass. To the north of the skylight and about the center of its length was a vertical 6-inch steel pipe, the main water pipe of the sprinkling system, which came up through the cement floor from the second floor. The testimony is conflicting and confusing as to whether it went through the ceiling or only up to it. In any event at its upper end it was joined to a cast iron T-shaped coupling from which there were 4-inch pipes, one leading to the east and the other to the west. From these smaller pipes others ran to various parts of the top floor.

The inoperative sprinkler system was being removed because trucks were backing into the pipes at times. Also, the redecoration of the building was contemplated and the removal was desired to remedy that which was deemed an unsightly condition. Neither of the defendants consulted with the plaintiffs prior to the removal.

Myrll Meeks, who was the president and majority

stockholder of the Meeks Rent-A-Car Company prior to the change of its name and before the fire, had died prior to the trial of the cause in district court. He had made the arrangements with Jack Levey, a partner in Service Junk Company, for it to remove the sprinkler system. The work was actually performed by Morris Romero and one Johnson, both employees of the Service Junk Company which paid them for their labor. Romero was paid $1.25 an hour. Meeks Rent-A-Car was to pay nothing to the Service Junk Company for the removal of the system. Service Junk Company was to pay Meeks Rent-A-Car for the salvage dependent on the value of that which could be renovated for resale and the weight of the junk that was left, less, however, the cost of the labor incurred in its removal.

On Friday, January 9, 1959, the day before the fire, Romero and Johnson reported at the place of business of Service Junk Company. The partner Jack Levey took them to Mid-City Motors where they arrived about 6 a.m. He showed them what to cut and left them there. Levey said he told them to cut only what Meeks had specified. The workmen had the torch and necessary tools. Levey again came for them at the close of their work-day with a truck and helped them load the pipe and material they had cut down. Levey had been instructed by Meeks to get the men out of the building before the traffic came in because they would then need all available space. On the afternoon of January 9, 1959, Levey arrived for the men and materials about 2:30. He helped them load and left with truck and men between 3 and 3:30 o'clock. He testified he checked the work of the men before leaving and did not see any fire or smell any smoke.

Prior to January 9, 1959, Romero and Johnson had been engaged in removing this same sprinkler system from other floors of the building. They used an acetylene torch to cut pipe. This was the first day they had worked on the top floor. They were cutting pipes near

the center of the building. The work included the removal of the 6-inch vertical main water pipe to the north of the skylight that came from the floor beneath. Romero handled the torch where its use was necessary. Uncontroverted testimony shows that he was a skilled and experienced man in handling such equipment.

Romero himself testified he cut the large 6-inch pipe near the floor and cut it again twice making "one close to the floor, and two close to the ceiling; well, down from the ceiling." The torch melted the metal making the pipe "cherry red." He cut also a 4-inch pipe coming out from the 6-inch pipe. The closest he got to the ceiling in cutting with the torch was 18 inches. He testified the work near the ceiling was started at 11 a.m., and was finished about noon. The rest of the time they were cutting elsewhere. They cut some of the material as it lay on the floor. The torch was completely turned off between 2:30 and 3 o'clock. He had shielding material but he did not use it because it was unnecessary as he was directing the sparks towards the floor. None of it went to the ceiling or he would have used the shield. He did not examine the ceiling material nor go up and look as to the contents of the attic although he states Bill Johnson made inquiry about it. His boss came between 2:30 and 3:15 o'clock and they loaded the pipe and got out of there shortly after. Before going, Johnson and he walked about and checked for fire and found none.

There was testimony, however, from other witnesses to which the jury could have given credence that about 3 o'clock that afternoon the two men were still upon a scaffold cutting pipe. They were using a torch at that time and sparks were shooting out in all directions. It looked like a "Roman candle" and some sparks were thrown against the ceiling. They were then cutting, according to the testimony, a "nice size pipe" near the center of the building 4 or 5 inches from the ceiling.

There was testimony that the sparks at times were flying 10 to 20 feet.

The first fire alarm, according to the testimony of Walter Downey, assistant investigator of the Omaha fire department, was at 1:41 a.m., January 10, 1959. It was followed by a second alarm at 1:47 and a third at 1:55.

Fire captain James B. O'Brien testified on approaching the scene of the fire he first observed smoke and fire coming from behind a sign on the roof of the building, the smoke and fire being near its center. According to him the fire had been burning from half an hour to an hour. Other members of the fire department testified to the same observation made on approaching the burning building. The big door of the garage could not be opened but a small door was found unlocked by the first fireman who arrived there. The building, however, was so full of heavy smoke they could only enter 6 or 7 feet and by looking underneath they saw a red glow near the center of the garage.

Chief arson investigator Dan Mulcahey and Walter Downey, an assistant investigator, removed exhibits 30, 30A, 33, 34, and 34A, together with pieces of celotex ceiling material from the garage after the fire. Mulcahey testified that the large pipe, exhibits 30 and 30A, had been cut by an acetylene torch. Exhibits 33, 34, and 34A were brackets which this witness said he found in the center of the garage building after the fire. They are shown to have been attached to the ceiling and to have held up certain parts of the pipe belonging to the sprinkler system. He found also some screws in a piece of wood remaining after the fire in the center of the building, one of these brackets having been attached to the wood by the screws. The screws were not offered in evidence. The false ceiling material taken from the debris at the scene was tested by Mulcahey. He held a match under the middle of the piece he found for 2 minutes. He found it would burn slowly like "punk" com-

monly used on the Fourth of July. He used two or three matches and a lighter on different spots. It was not too hard to start with a match which they applied. In 2 minutes it burned an area of about 2 inches. The ratio of its burning was 2 inches to 2 minutes. It smoked very little but when burning it did give off a gas which you could smell. It left an ash.

A witness, Raymond R. Voycheske, ran a business known as Ray's Body Shop apparently on the second, or middle floor, of this building. The men were cutting pipe a few days before the fire on the lower floor of the building and he had noticed sparks coming up into his place of business through a 2¼-inch pipe with an elbow on it. He reported this to the men working and they said they were through with whatever they were then doing.

Professor W. F. Weiland, formerly an instructor in mechanical engineering at the University of Nebraska, testified the sections of pipe, exhibits 30 and 30A, and the brackets, exhibits 34 and 34A, had been cut by an acetylene torch. The distance from the top of exhibit 34A was a maximum 2⅝ inches and exhibit 34 was 2 5/16 inches. He likewise tested the ceiling material which he said resembled a type of celotex. He found it would not normally flame alone. If fire is held to it some flame will be noted. If the fire is removed it will continue to burn like punk until all the material is reduced to ashes. While burning, it generates heat and if the process continues until it comes in contact with dust, paint, or some such material you can occasionally get a burst of flame. Otherwise it will smoulder for a long time under right conditions. He was able to cause it to smoulder and occasionally to burst in momentary flame. A match and also a little propane torch were applied. In burning it leaves an ash and a smoke or gas is emitted.

Professor Weiland further testified that the flame of an acetylene torch might be as high as 5,000 degrees Fahrenheit; that the melting temperature of steel is

2,600 to 2,700 degrees; and that the ceiling material would ignite at less than 1,500 degrees and wood at around 700 degrees. When the flame of an acetylene torch contacts with steel, sparks which are bits of molten metal are emitted which can be directed for some distance depending upon the force of the pressure used in the cutting mechanism. The bits of molten metal will be equivalent in temperature to the steel being cut as they leave the metal. As long as these sparks can be seen and show their incandescence their temperature exceeds 1,400 degrees. The professor testified it was possible that on cutting the pipe with such a torch when held within 4 or 5 inches from this ceiling material that it could be ignited; that if the large pipe was being cut within a distance of 18 inches to 2 feet of the ceiling and material and sparks were being emitted in every direction that also would possibly cause it to be lighted and to smoulder; and that it is possible for such smouldering material to retain enough heat to ignite wood or other material almost indefinitely.

There is testimony wholly unrefuted that someone was present in the building on the top floor at all times from 3 p.m., on Friday, January 9, 1959, to 12:30 a.m., on Saturday, January 10, 1959. Frank Brady, the night manager, came to work at 3:05 p.m., and took charge of car and truck renting and storage. Generally the rental trucks went out from the time he came till as late as 7 o'clock. Some did not return until midnight. All cars except storage came in the big door on the top floor. He was all over the place including all three floors until 12:30. If cars came in late and the other floors were locked, he parked them on the top floor. They were quite busy. Vehicles were coming and going through the big door. The big door was being opened and shut constantly. Whenever it was opened there was a draft. The defendant Mid-City Motors lost nine cars and three trucks of its own in the fire. Five cars went out before and stayed out. A truck with a dolly on it came in at

11:30 or 12 o'clock. He was supposed to close up at 12 o'clock but a truck driver, Walter Haarstick, called from Glenwood, Iowa, at 11:30 wanting Brady to wait for him. Haarstick later testified he got there a few minutes after midnight, drove in, parked his own car, and walked out. Brady checked all the floors to see the doors were locked, as he says he always did, and there were no fires in any of the cars or trucks. After Haarstick left, Paul Peterson came unexpectedly while Brady was preparing to leave and he had to unlock the door to let him in. Peterson drove his own car inside and parked it. Haarstick's car had been put in Peterson's stall. Brady pulled Haarstick's car out so Peterson, who parked his own car, could place it there. They were to the north of the center of the building. Brady and Haarstick walked together to the front where Haarstick used the phone. When Peterson left, Brady replaced the padlock, unscrewed the fuses in the fuse box, and left, All of the doors were locked. Romero, who handled the torch, happened to have a job washing cars with Mid-City Motors. He came back in the evening at 6 o'clock before the fire. The wash racks on the second floor were within 40 feet of the large pipe which came through the floor. It is a closed room with a wide door to let cars in and out. The cars were returned to the main floor after washing. He parked them as he completed washing near the central area. At times he glanced up to the ceiling where he had been working. It took 45 minutes on an average to wash a car and he worked until 11:30 or 12 o'clock. He saw no fire, smelled no smoke, and saw nothing fall from the ceiling. All persons mentioned in this paragraph testified they did not see any fire or smell any smoke or gas. It is true that Haarstick and Peterson did not make any examination or pay particular attention, however, they would have both walked quite close to the central area on leaving.

The safe and the three front doors had been locked when Brady left after midnight. They had all been

checked by him before leaving. When he came back the next morning after the fire, the safe was open. He was called back at 3:45 to examine the safe's contents. He was unable to state whether anything had been taken. Part of the contents had been burned up. There was still money there, however, although some of it had been burned. The money had not been placed in the safe by him and he could not tell whether any had been taken.

This is the substance of the testimony that the plaintiffs contend shows that both of the defendants Mid-City Motors and Service Junk Company were negligent and that their negligence and the negligence of each of them caused the fire that destroyed their building.

There is evidence offered by the plaintiffs and the separate defendants which might go to show either that Mid-City Motors had charge of and really was directing the work and that the workmen might be its agents, or that the work was wholly undertaken by Service Junk Company as an independent contractor which has not been detailed here because it does not enter into our decision of the cause.

Both of the parties cite and discuss the case of Howell v. Robinson Iron & Metal Co., 173 Neb. 445, 113 N. W. 2d 584, in which the following rules are set forth that are applicable here: "In an action for damages predicated on negligence the burden of proof is on the plaintiff to adduce evidence that the neglect charged either alone or in connection with other acts was the proximate cause of the damages.

"Negligence is never presumed, and it cannot be inferred from the mere fact that an accident happened.

"The burden of establishing a cause of action by circumstantial evidence requires that such evidence, to be sufficient to sustain a verdict or require submission of a case to a jury, shall be of such character and the circumstances so related to each other that a conclusion fairly and reasonably arises that the cause of action has

been proved.

"The burden of a plaintiff, relying on circumstantial evidence to sustain a cause of action for damages, does not require him to exclude the possibility that damages flowed from some cause other than the one on which he relies.

"If circumstantial evidence is susceptible of any reasonable inference inconsistent with an inference of negligence on the part of the party charged, it is insufficient to sustain the charge or to require submission of the issue to a jury.

"In a case where reasonable minds may draw different conclusions as to whether or not acts of negligence charged have been proved, a question for determination by a jury is presented."

In the cited case of Howell v. Robinson Iron & Metal Co., *supra,* this court reversed the judgment of the trial court in directing a verdict for dismissal of the action holding that the evidence in that case disclosed facts from which both an inference of negligence and inference that such negligence was the causation of the fire were shown sufficiently to present a question for the jury. The plaintiffs in the cause before us claim that the facts in the case before us are so similar to those in the cited case that a jury question is presented here also. We think, however, the facts are quite dissimilar and that the difference therein distinguishes the two cases. In the case of Howell v. Robinson Iron & Metal Co., *supra,* the defendant was removing pipe by means of an acetylene torch from one end of the building under the exclusive control of the defendant. The building was for the most part wood and the interior was lined with cardboard. The cutting was done generally throughout the interior and near the cardboard walls. The floors were unswept and littered with combustible materials which had not been wetted down. The personnel performing the work did not use baffle plates which would have arrested and contained the sparks from the torch. Those in

charge of the work, employees of the defendant, left the premises for the day at 5:10 in the afternoon without making any final inspection for smoke or fire. The fire was reported at 7:50, or 2 hours and 40 minutes later. It was then in an advanced stage. No one had been in the building or was about the premises during the hours between when the employees left and the fire broke out. All the doors and windows were barricaded with one exception.

The plaintiffs cite Behrens v. Gottula, 160 Neb. 103, 69 N. W. 2d 384, where this court stated: "It is sufficient if all the facts and circumstances in evidence fairly warrant the conclusion that the fire did not originate from some other cause, and the origin of a fire has generally been held sufficiently established by inferences drawn from circumstantial evidence." This was a case in which there was a cracked manifold and a broken exhaust pipe on a motor truck of the defendant, and there was testimony that it was probable that sparks would come out of the crack and be emitted through the muffler. There was testimony that about a quarter until 4, lunch was taken to the working men; that the truck was parked with corn husks under it; and that within a short time after taking lunch out to the men, a witness saw a fire underneath the cab of the truck. The truck was burning and the husks under it were afire. The truck's motor had been shut off only a minute or two before the fire and thereafter the fire spread to the buildings involved.

We are cited also to the case of Kearney County v. Chicago, B. & Q. Ry. Co., 76 Neb. 861, 108 N. W. 131, decided in 1906, where the county recovered judgment against the Burlington for the loss of a bridge by fire, and where this court held that the evidence was sufficient to allow the jury to determine the origin of the fire to have been the passing locomotive. The witness testified he saw the train passing over the defendant's line and about 5 minutes afterward discovered the fire

south of the railroad track about a quarter of a mile burning in the direction of the bridge, and it had burned to within 3 or 4 rods of the track. Another witness testified it burned over the ground within 2 or 3 rods of the track. There was no conflict in the evidence and no other theory of the origin of the fire was advanced except that the train which had passed so shortly before caused the sparks to be emitted which started it.

We do not think the facts in any of these cases are so similar to those before us as to be determinative of the present case. Neither are we required to discuss the evidence as to whether the persons operating the torch engaged in cutting the pipe and steel on the premises were negligent in its operation. We may assume for this opinion that negligence has been shown.

The real void in the asserted cause of action disclosed by the evidence in this cause is the failure, in our opinion, to show that any of the alleged negligent acts caused the fire which ensued. It seems unbelievable that a spark could set the ceiling afire at not later than 3:30 in the afternoon of the previous day and smoulder until after 12:30 the following morning, in all 9 hours, in the garage in question with people there constantly, none of whom saw any fire, smelled any gas or smoke, or saw any ashes. Particularly is this true in view of the testimony of Dan Mulcahey that the ceiling material which he lighted, while burning like punk, consumed an area 2 inches wide within 2 minutes. If indeed it had smouldered all this time, it would seem without question that a considerable area of the ceiling would have been burned, a considerable amount of gas would have been emitted, and ash would have resulted; and that a failure of someone to detect it would have been well nigh impossible. The evidence presented is not sufficient under the rules stated to show such an interrelation of circumstances that a conclusion fairly and reasonably arises that the proximate cause of the conflagration has been established.

Moreover, the evidence to the effect that the outside door which had been locked was unlocked and that the safe which had been closed was open are circumstances which are "susceptible of any reasonable inference inconsistent with an inference" that the negligence of the defendants was the proximate cause of the fire within the rules set out in Howell v. Robinson Iron & Metal Co., *supra*. The plaintiffs point out that they are not required to exclude the possibility that the damages flowed from some other cause. Still all inferences as to the cause of the fire disclosed from the evidence must be considered by the court in determining whether or not the evidence of proximate cause is sufficient to submit the case to the jury.

We believe the trial court did not err in sustaining the motion of the defendant Service Junk Company to direct a verdict or dismiss the case at the close of all the evidence.

The plaintiffs, however, contend that the trial court erred in excluding certain evidence which they sought to introduce and which they assert would have strengthened their case as against both of the defendants. Professor Weiland was asked the following question by plaintiffs' counsel: "Q. (by Mr. Walsh) Let me ask you this, Professor: Would you have an opinion if ceiling material of the nature that you removed from the Meeks building, once ignited by any source, once started to smoulder for any reason, if it could continue to smoulder and retain heat sufficient to cause fire for a period of twelve hours? MR. TIERNEY: Just yes or no. A. Yes." He answered that he had such an opinion. When asked what that opinion was, objections were made on behalf of both the defendants and sustained by the court. They included that there was no sufficient foundation, that it was incompetent, irrelevant, and immaterial, and did not correctly state the evidence. Counsel said that if permitted to answer he would have answered yes. The plaintiffs assign error to such exclusion. The professor

had fully testified as to the possibility that the fire could so smoulder for an indefinite period. The question of whether or not it could so smoulder undetected and cause the fire was first for the court to decide as to the sufficiency of the evidence to require the submission of the question to the jury, and if submitted, that conclusion was a question for the jury to ultimately decide. It is not the office of an expert witness to give his conclusions of the ultimate fact to be determined, but it is for the court to decide and for the jury to make its decision in case it is submitted to it.

In the case of Neal v. Missouri P. Ry. Co., 98 Neb. 460, 153 N. W. 492, this court stated: "Complaint is made because some of the firemen were not permitted to express an opinion stating where the fire started. On the record made, the determination of that fact settled the case. The issue did not call for the opinion of an expert. After the evidential facts were stated, the jurors were as competent as the firemen to draw a conclusion. Under the circumstances of this case, the opinion of experts on the ultimate facts to be determined by the jury was properly excluded." Cases were cited. The contention of the plaintiffs is without merit.

There was certain evidence admitted against the defendant Mid-City Motors alone which the court expressly and properly instructed the jury was not to be considered against Service Junk Company because they were admissions which affected the former only. It included exhibit No. 2, a petition filed on July 19, 1960, in the district court for Douglas County, Nebraska, by Meeks Rent-A-Car prior to the change of its name to Mid-City Motors, against Service Junk Company. In that petition the defendant Meeks Rent-A-Car alleged the negligent acts of the Service Junk Company using almost the same allegations as are now charged by the plaintiffs against both of the defendants, and further alleged that said negligent acts were the cause of the fire. It is the contention of the plaintiffs that the admission in this peti-

tion by the defendant Mid-City Motors under its previous name that the negligent acts of Service Junk Company and its employees were the cause of the fire, was sufficient to submit the issue of proximate cause as to it to the jury. A reading of the record indicates that the trial judge considered it sufficient.

Objections were made to the admission of the petition in evidence by Mid-City Motors. It objected at trial claiming there was no sufficient foundation laid for its admission. It urges there was no showing that identifies Meeks Rent-A-Car with the defendant Mid-City Motors in that instance because it was filed after the change of name, or that the attorney who filed the petition or the attorney who verified it on information and belief had authority to bind the corporation. The appellant Mid-City Motors assigns error to the trial court in admitting it in evidence. We do not think it necessary to determine the issues with respect to its admission but for the purpose of this opinion it will be considered in evidence.

In 31A C.J.S., Evidence, § 382, p. 939, the effect of admissions with regard to their sufficiency to establish a cause of action is considered: "In the absence of opposing evidence or in the light of the surrounding circumstances or other evidence in the case, an admission against interest may be sufficient to establish the fact admitted, or the cause of action or liability or defense resting on proof of such fact, and it has been considered that cogent or full and unquestioned proof is required to overcome the effect of a deliberate admission.

"Conversely, the circumstances or other evidence in the case may render the admission insufficient to establish that for which it was offered in evidence."

We are cited by the plaintiffs to the case of Paxton v. State, 59 Neb. 460, 81 N. W. 383, 80 Am. S. R. 689, affirmed on the rehearing, 60 Neb. 763, 84 N. W. 254. The case was a suit to recover against the bondsmen of one Bartley, State Treasurer of this state, who was found

to be a defaulter at the end of his second term. The bondsmen from whom recovery was sought had signed the bond given by Bartley on his second term. The bondsmen as defendants had introduced in evidence the transcript of the record of the district court for Lancaster County showing the State had instituted and there was still pending suit brought on behalf of the State by the Attorney General on his own motion and as requested by the Governor to recover a large sum of money because of an alleged shortage at the conclusion of Bartley's first term. The trial court had directed the verdict for the full amount of the shortage shown at the close of the second term. This court held the ruling was erroneous and prejudicial and that it required the submission to the jury the question of whether some of the money was taken by Bartley in his first term. It does not plainly appear in this case whether there was other evidence which might substantiate such taking in the first term but certainly there is nothing in the opinion to indicate that the other evidence before the court would refute these admissions.

Other cases have been before this court in which admissions have been held sufficient to make a prima facie case. In Orchard & Wilhelm Co. v. Petersen, 127 Neb. 476, 256 N. W. 37, the admissions of an employer made in a report of an accident to the compensation commissioner were held to be sufficient to prove how, when, and where the injury occurred. See, also, with the same effect, Meyer v. Platte Valley Construction Co., 147 Neb. 860, 25 N. W. 2d 412.

These cases quite clearly show that the rule in the first paragraph of the quotation taken from 31A C. J. S., Evidence, § 382, p. 939, has been adopted by this court but we think it by no means excludes the rule conversely set out in the second paragraph if it is applicable to the case at hand. We deem that also should govern in a proper case, and must be considered with respect to the one before us.

The decisions in the following cases lend support to the cited rule that circumstances or other evidence in the case may render such admissions alone insufficient to establish that for which they were offered in evidence. They all come from other jurisdictions.

The case of Phillipson v. Moore, 204 App. Div. 140, 198 N. Y. S. 290, was one to recover damages for personal injuries suffered by the plaintiff when he was run down by the defendant's automobile which was being operated by the defendant's chauffeur. The question to be determined was whether the automobile was being operated at the time of the accident for the benefit of the defendant, owner of the car, or whether it was being used on private business of the chauffeur. The court said: "On the issue thus presented the plaintiff rested his affirmative case, not upon the presumption that arises out of the ownership of the car (Potts v. Parde, 220 N. Y. 431), but upon the admission contained in the original answer that the car at the time of the accident was used in the defendant's business." There was evidence in the case by the defendant and by the defendant's chauffeur to the effect that the chauffeur was driving to meet his own brother and that his direction of travel and whereabouts at the time clearly showed that he was not in his employer's business. The plaintiff undertook to meet this evidence by testifying that the chauffeur told him that his boss had given instructions for him "to go up street" and that he supposed he was doing so for his boss. The court in considering this evidence stated: "It appears from the colloquy above detailed that the idea that McAuliffe was going up town on his 'boss's business' originated with counsel and that although the plaintiff swore that what the witness McAuliffe said, all he said, was, 'I had to go up street and that is how he hit me,' counsel persisted until his own phraseology was used. The plaintiff's evidence on the most vital issue in the case is so contradictory as to rob it of credibility. If we discard it as we think we

should there is nothing left but the admission in the original answer. We think in itself as evidence it is not of such substance as to make up the preponderance of the evidence and support alone the burden of proof cast upon the plaintiff. As between the plaintiff and defendant the evidence of McAuliffe is that of a disinterested witness. He is corroborated in his version that he was using the car on an errand of his own by the unshaken testimony of the defendant. Under such circumstances no liability rests upon the defendant for the plaintiff's injury. We think the verdict is clearly against the weight of the evidence and should be set aside and a new trial granted."

The case of Brooks v. Rubin (Mo.), 293 S. W. 2d 295, is an action for injuries sustained by the plaintiff, a minor of 15 years, when a railing on a stairway gave way, based on the theory that the landlord-tenant relation existed between defendants and the plaintiff's parents. It was held that the direction made by one of the defendants to fix the railing thereafter was insufficient under the plaintiff's evidence to constitute an admission from which the jury could reasonably find that the defendants retained control of the stairway. The court, in its opinion, stated: "Consequently the question is whether Rubin's direction to unknown persons, one of whom could have been Herman Strecker's brother, to fix the railing as best they could, was, considered in the light of all of plaintiff's evidence, sufficient to make a submissible case on the issue of retention of control. We have the view that it was not. That, for these reasons. It was admitted that defendants were the lessees of the entire premises and the lease under which they held was put in evidence by plaintiff. That lease showed that defendants as lessees had an obligation to the owners (irrespective of any obligation to plaintiff) to keep the entire building in good repair. Thus, Joseph Rubin had a duty to the owners to see that the stairway was repaired. Furthermore, as we have noted, plaintiff's evidence nega-

tived the proposition of the defendants' liability by virtue of any duty to maintain the common porch as plaintiff's landlord. Under those circumstances, we are of the opinion that defendant Rubin's direction to fix the railing was insufficient, under all of plaintiff's evidence, to constitute an admission from which a jury reasonably could find that defendants retained control of the stairway."

The case of United States v. O'Rourke, 125 F. Supp. 769, was a habeas corpus proceeding to obtain the release of a petitioner who was held under a warrant for his deportation as an alien. The government relied upon an admission in a statement given to an investigator in 1949 wherein the petitioner admitted that he was born in China. The court reviewed all the evidence and found that the opposing evidence in the light of surrounding circumstances indicated without doubt that the admission was not true. It laid down the following rule: "In absence of opposing evidence or in light of surrounding circumstances, admission against interest may be sufficient to establish fact admitted, but other evidence in the case may render the admission wholly insufficient to establish such fact."

The case of Giles v. Herzstein, 49 N. M. 41, 156 P. 2d 160, was an action to recover the sum of $1,950 alleged to be owing as one-half the profits made in a joint venture in buying and selling cattle. A judgment was entered upon the verdict of the jury for $775 in favor of the plaintiff and the defendant appealed. The court held the admission of the defendant that "these cattle made some $3,940.00," was without substantial support in the evidence and a judgment was ordered entered for the defendant.

The decisions in other cases which lend support to the same rules of evidence include: Skene v. Marinello Co., 270 F. 701; Engle v. Clarke (Ky.), 346 S. W. 2d 13; Potter v. Robinson, 233 Iowa 479, 9 N. W. 2d 457; Procell v. Peerless Insurance Co. (La. App.), 137 So. 2d 447.

We have hitherto determined that the evidence in the case aside from the admissions in this petition is insufficient to raise a reasonable inference that the alleged acts of negligence were the proximate cause of the fire. The trial was of considerable length. Testimony was had on behalf of the plaintiffs and the defendants and has been hitherto summarized by us. The petition was filed in another suit against the codefendant Service Junk Company in which it was alleged to be an independent contractor. We hold in the face of the other evidence presented that the admissions contained in this petition are not sufficient to make a prima facie case to show the causation of the fire under the circumstances disclosed. There is in the direct evidence concerning the fire nothing to sustain or strengthen the admission. It seems to be directly contrary to the inferences raised by the other evidence taken as a whole.

The plaintiffs in the cross-appeal assign error to the trial court in not receiving in evidence further admissions made by Myrll Meeks, president of Meeks Rent-A-Car prior to his death, in a statement given to arson investigator Mulcahey which were sought to be entered in evidence. The plaintiffs in their cross-appeal refer to some seven pages of evidence stating that they had made an offer separate as to each question and answer and contending that at least some of the statements should have been admitted.

The only objections to questions which were sustained by the trial court which are pointed out with any particularity as erroneous concern the statements of Meeks to Mulcahey giving his opinion as to the cause of the fire. It is quite plain that the statements Meeks gave were his opinions only in answer to questions as to what his opinion was in each case.

In Kellner v. Whaley, 148 Neb. 259, 27 N. W. 2d 183, it was said: " 'To be competent as an admission a statement must be one of fact, and a statement which is a mere opinion or conclusion or a conclusion of law is as

a rule inadmissible.' 31 C. J. S., Evidence, § 272, p. 1025." His opinion of the cause of the fire given solely as an opinion should not have been admitted and the contention of the plaintiffs is without merit.

We find that the evidence with respect to Mid-City Motors is also insufficient to show causation of the fire and its motions for dismissal made at the close of plaintiffs' evidence and at the close of all of the evidence should have been sustained and that the motion for judgment notwithstanding the verdict should have been granted.

It follows that the judgment dismissing the action as to the defendant Service Junk Company should be and is affirmed, and that the judgment recovered against the Mid-City Motors should be and is vacated and its motion for judgment notwithstanding the verdict should be and is sustained.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

WHITE, C. J., dissenting.

I respectfully dissent from the majority opinion in this case. The evidence established that employees of the Service Junk Company were using an acetylene cutting torch, or torches, while cutting some steel pipe in close proximity to a false ceiling on the main or top floor of the building involved. There was evidence that the cutting took place as close as 4 or 5 inches to the celotex material in the false ceiling. There is further evidence that there were brackets that were holding the pipes and that these brackets were fixed to wood which was positioned above the ceiling material. It is undisputed that the ceiling material of celotex would, if touched by a spark, smolder. It clearly appears in the evidence that this material, once ignited, continues to burn like a punk material and would hold heat for a long period of time. The acetylene torch cutting operation took place as late as 3 p.m. on the afternoon prior to the fire. The fire occurred sometime later. The first alarm was turned

in at 1:41 a.m., about 10½ hours later. Members of the Omaha fire department first observed it confined to the roof of the center portion of the building at about the same location as the employees of the Service Junk Company were last seen working. One witness testified that when he first entered the building, he saw the fire and "it was like a glow towards the ceiling of the building." The same witness, a retired captain of the fire department, when asked if he saw any fire down on the floor answered, "Not directly on the floor, I never; towards the ceiling, I did, it was glowing there." The flame of an acetylene torch may be as high as 5,000 degrees Fahrenheit. The melting temperature of steel as was present in the steel pipes is around 2,600 to 2,700 degrees Fahrenheit. The ignition temperature of the ceiling material, which could burn like a punk, was somewhere around 1,500 degrees Fahrenheit. The ignition temperature of wood is generally around 700 degrees Fahrenheit. Ignited steel sparks from the use of an acetylene torch have ample heat to ignite material such as the celotex material in the false ceiling. During the cutting operation, steel sparks were observed flying in all directions, from the point of cutting, like a "Roman candle." Material at a distance as far as 2 feet could be ignited by steel sparks as their temperature can be from 1,400 degrees Fahrenheit on up. The evidence shows that the workmen did not use a shield to protect the roof or the ceiling from sparks; that the pipe ran up through the false ceiling of celotex; that before starting to cut, the workmen made no examination of the ceiling material to determine if it were flammable; that no examination was made or ascertainment made as to what types of materials or what might be in the attic above the false ceiling; that they made at least two cuts in the pipe close to the ceiling; and that the cutting was within 4 to 5 inches of the celotex material in the false ceiling.

In evidence in this case are the following questions and answers given by an expert mechanical engineer:

"Q. Professor, going to this ceiling material that you removed from the Meeks building, did you make any tests on that material to determine if it was flammable, if it would burn? A. Yes, I did. Q. And what were your findings in that regard? A. That material normally will not flame, but under the right conditions it will smoulder; that is, you hold a fire up to it, and as long as the fire is up against it, you will note some flame, but if you remove that fire, *it will continue to burn like a piece of punk,* and occasionally if that burning process continues and comes into contact *with dust or paint or something on that order that may be on the surface of such material, you occasionally get a burst of flame. But otherwise under the right conditions it can continue to smoulder for long periods of time."* (Emphasis supplied.)

The pipe that was being cut was fairly close to the center of the building. Fire captain James B. O'Brien, on arrival at the scene, observed that it seemed as though the blaze was toward the middle and upper area of the building. Another fire department employee also placed the fire in this area.

Negligence is a question of fact and may be proved by circumstantial evidence and physical facts. The law does not require that other possibilities of causation be negatived. All the law requires is that the inferences from the facts shall indicate with reasonable certainty the negligent act charged. Howell v. Robinson Iron & Metal Co., 173 Neb. 445, 113 N. W. 2d 584; Gilliland v. Wood, 158 Neb. 286, 63 N. W. 2d 147; Shields v. County of Buffalo, 161 Neb. 34, 71 N. W. 2d 701. The pertinent rule as applicable to this case is stated in Howell v. Robinson Iron & Metal Co., *supra,* and was evoked with reference to the facts about as similar as one can find to those in the case at bar as to causation of a fire. Therein it was stated: "The true rule as applied to this case, as is made clear by the cases cited herein, is that if *different minds may draw different conclusions* or inferences from

the adduced evidence *as to whether or not it has been shown with reasonable certainty that the fire was caused* by the negligent acts charged, the matter at issue must be submitted to a jury." (Emphasis supplied.)

I will not burden this dissent with a close recital of all of the evidence in the Howell case, *supra*. It is a recent case and the opinion was written by Judge Yeager. In that case, the court held that there was no direct evidence as to what caused the fire and none whatever as to the specific location of its beginning. In this case, we have facts from which it can reasonably be inferred that the area in the building from which this fire was originated was the same area in which the cutting operation with the acetylene torches was performed. In the Howell case, *supra*, the fire was caused by the use of an acetylene torch in a wood and concrete building in Omaha, Nebraska. The walls were of cardboard material and the acetylene torch operation set the cardboard material on fire, or at least the court held that circumstantially the jury could infer such to be the fact. It seems to me, within the meaning of the above rule, that different minds could draw different conclusions from this evidence as to *whether or not it has been shown with reasonable certainty* that the fire was caused by the acetylene torch. It seems that the true purport of the majority opinion is to analyze the evidence and come to a conclusion factually upon the evidence presented that *the greater weight of the evidence* is with the inference that the fire must have been caused from some other unexplained and undefined possible source. The real point is that different minds, considering the common experience of mankind, could draw different reasonable conclusions or inferences as to *whether or not it has been shown with reasonable certainty* that the fire was caused by the acetylene torch operation happening at 3 p.m. the previous afternoon.

The only difference that I can see between the Howell case, *supra*, and the case at bar is the length of time

that elapsed, it being about 3 hours in the Howell case and approximately 12 hours in the case at bar. But, the evidence is that *the celotex material in the false ceiling could smolder for an indefinite period of time.* I fail to see where the exact point of time that it came into contact with other material that burst into flame could be particularly significant. The point is that there is a probable cause and connection between the two events because of the continued smoldering intensity of the temperature in the punk material. The significance of the time elapse is for the jury. The authorities support this course of reasoning. In 22 Am. Jur., Fires, § 47, p. 625, it is stated as follows: "Time, distance, and the fact that the fire burned over intervening tracts of land do not affect the question of the defendant's liability, except in so far as they relate to the probability of an intervening cause * * *. In the determination of the proximate cause, no arbitrary limits can be fixed as to nearness in point of time * * * from the original starting of the fire. Much more important are the closeness of causal connection, the natural sequence of the original wrongful act, and whether the resulting loss should or might have been anticipated."

The pertinency of the above language is apparent. The smoldering material, the negligent production of sparks in the operation of the acetylene torch in close proximity to the celotex material, set up a chain of causation. I do not think that the arbitrary selection of a time period should be the controlling consideration. If this be true, at what point of time then would we say that it was a short enough period that the jury would be allowed to come to the conclusion that the fire was started by the acetylene torch?

The majority opinion apparently holds that the fact that a door was unlocked and that a safe was open gives rise to a reasonable inference that the fire was caused by some other person or agency. I submit that this is speculation and conjecture and not the basis of reason-

able inference. The same argument was rejected in Howell v. Robinson Iron & Metal Co., *supra*.

The case should be submitted to the jury because of the admissions against interest made by the defendants. The defendant Mid-City Motors, Inc., in another action pleaded that the acetylene torch cutting operation caused the fire. This pleading was introduced in evidence as an admission against interest. Outside of the factual evidence introduced in the case,. which has been discussed, this admission alone was sufficient to carry the case to the jury. The majority opinion discusses at length the significance of an admission against interest of this type. It is not questioned that the admission was properly admitted in evidence, and the majority opinion does not so hold. The quotations from Corpus Juris Secundum and the other cases cited in the majority opinion simply hold that an admission against interest of this type is not conclusive and it may be rebutted by other evidence. With this conclusion and the holdings of these cases, I do not disagree. But, the affirmative evidence introduced by the plaintiffs, as set out herebefore in this dissent, is certainly consistent with and supports the admission against interest that was offered and received against the defendants in this case. It surely does not serve to rebut it. But, even assuming that it does tend to rebut it, it would still be a question for the jury to weigh the admission against interest together with all of the other evidence as to determination of the negligence of the defendants and the proximate cause of the fire.

The majority opinion holds that the expert witness called by the plaintiffs could not answer a hypothetical question eliciting his opinion as to the cause of the fire. The sufficiency of the expert's foundation was not questioned. The testimony was rejected because the witness could not be permitted to testify as to an ultimate fact as this was an invasion of the province of the jury. I think that this testimony is admissible and the doctrine

announced in the recent case of Petracek v. Haas O.K. Rubber Welders, Inc., 176 Neb. 438, 126 N. W. 2d 466, applied. In that case, it was said: "Ordinarily it is error to permit an expert witness to give his opinion on the ultimate fact to be determined by the jury. * * * It is not a valid objection to the evidence of an expert that the answer covers the *whole ground the jury is to decide, if the case is one to be wholly resolved by such evidence.*" (Emphasis supplied.)

This court is faced with a jury verdict finding causation in this case. It is not suggested that it was not properly instructed on the issue of circumstantial evidence.

It seems to me that we are substituting our judgment on the weight of the circumstantial evidence rather than a determination as to whether there is sufficient evidence for the jury to weigh.

I am authorized to state that Judge Spencer and Judge Boslaugh concur in this dissent.