Judith Marie **BARNES**, Guardian of the Estate and of the Person of James D. Barnes, Appellant,

v.

**OMARK INDUSTRIES, INC.,** Appellee.

No. 18086.

United States Court of Appeals Eighth Circuit.

Dec. 6, 1966.

Don M. Jackson, of Jackson, Wade & Barker, Kansas City, Mo., for appellant. Robert C. Jones, Kansas City, Mo., with him on the brief.

William H. Sanders, of Caldwell, Blackwell, Sanders & Matheny, Kansas City, Mo., for appellee. Dean F. Arnold and Larry L. McMullen, Kansas City, Mo., on the brief.

Before MATTHES, MEHAFFY and GIBSON, Circuit Judges.

MEHAFFY, Circuit Judge.

James D. Barnes, plaintiff, brought this suit to recover damages for personal injuries he sustained from the use of a powder actuated tool manufactured by Omark Industries, Inc., defendant.[1] Diversity of citizenship and the requisite amount in controversy establish jurisdiction. Trial to a jury resulted in a verdict and judgment for the defendant. For reversal plaintiff urges (1) that the District Court erred in improper admission of opinions of defendant's expert witnesses; (2) that defendant's counsel was erroneously permitted to read extracts from plaintiff's deposition in his argument to the jury; and (3) that the District Court erred in failing to include in its instruction on strict liability an admonition that contributory negligence constituted no defense. We affirm.

The hand tool involved, a "Drive-It 410," was manufactured by the defendant in 1954 and had been in the possession of plaintiff's employer, a sheet metal contractor, most of the time. This tool is somewhat similar to a firearm and was designed for the purpose of firing nails and other fastening devices into wood, concrete, steel and other construction materials to fasten one material to another. It is a tool that is commonly used in the construction industry and this was a .38 caliber device with a smooth bore barrel containing twelve gas ports near the muzzle of the barrel. It came equipped with a safety shield or pad five and a quarter inches square on the outside of the barrel to protect the workman from falling debris or ricocheting nails. The tool is operated by inserting a nail into the barrel with a shell containing gun powder behind the nail and is cocked by placing the muzzle of the barrel against the work surface and exerting pressure upwards from the handle which depresses the muzzle flush with the safety shield. When cocked in this fashion, the tool can be fired by turning a firing ring located on the barrel housing. It is designed to be fired with the safety shield flush and the barrel perpendicular to the work surface but has an angle fire control that permits firing if not more than six degrees off of perpendicular. This angle fire control permits the use of the tool on an uneven surface like concrete.

There are vertical lines in the center of each side of the safety shield which the operator uses as guide marks to be matched with similar marks penciled or

---

[1]. James D. Barnes after giving his deposition, became and was adjudicated incompetent, and his wife, Judith Marie Barnes, was appointed guardian and substituted as the plaintiff.

chalked on the work surface. This enables the operator to center the muzzle of the barrel on the exact point into which the nail is to be fired as such point and the muzzle are hidden from the view of the operator if he is properly positioned beneath the safety shield.

The accident occurred in the afternoon of February 23, 1961 while Barnes, a sheet metal apprentice, was fastening soft metal straps to a concrete ceiling in the Nallwood Junior High School in Johnson County, Kansas. The straps were ⅛ inch thick, 1 inch wide and approximately 20 inches long. Barnes was using a 2 inch nail manufactured by a competitor of defendant. The fastening was done with Barnes standing on an eight foot stepladder, shooting the tool overhead. When the strap was fastened to the concrete, it would be bent from the overhead surface and the remaining end fastened to ducts. When Barnes fired the shot which injured him, the nail went through the strap, entered the concrete, bent to the left, penetrated only a maximum depth of ⅝ of an inch and sheared the head from the shank. The nail reversed its course, came out of the concrete leaving a spalled area and struck Barnes on the top of the head above the ear on the right side penetrating the skull and going forward and down into his brain approximately two inches. Barnes was knocked from the ladder but not rendered unconscious. He was taken to St. Mary's Hospital in Kansas City, Missouri where on March 16, 1961 the nail was surgically removed.

The tool fell into a puddle of water and mud and was half submerged until retrieved by Barnes' foreman, James Stewart. Stewart cleaned the tool the following morning and used it to fire a number of heavier fasteners. It was then returned to the company office where it remained a short time, after which it was traded to a dealer for a gun of another make. It remained at the dealers's until November of 1961 when it was taken to the Kansas City Testing Laboratory. In March of 1962 it was again delivered to the Kansas City Testing Labo-

ratory. Thereafter, the tool was taken to Joplin, Missouri for test firing after which it was delivered to defendant early in 1963.

In addition to strict liability, Barnes pleaded negligence by defendant in the design and testing of the stud gun. Barnes contended that the safety shield was unsuitable and inadequate to offer that protection necessary to insure safety against injury from an allegedly inherently dangerous instrumentality. Also, the gas ports, found to have eroded through continuous use, were asserted to have been carelessly and negligently designed in that the erosion of the gas ports created a weakness in the barrel which was magnified by repeated firing as the head of each nail traveling down the barrel increased the grooving on the right side.

Defendant asserted that the safety shield was the largest designed for any comparable tool and the accident could not have occurred if the tool had been properly used and maintained in accordance with the instructions provided by it. In short, there was direct conflict in the evidence based on the physical facts as to how and why the accident occurred.

Plaintiff first assigns as error admission into evidence of opinions of defendant's expert witnesses allegedly based on "prejudicially erroneous hypothetical questions."

Defendant's expert witnesses had most impressive credentials. Three of the experts were experienced graduate engineers engaged in research, design and engineering of tools for the powder actuated tool industry. One of the witnesses designed the first tool of its kind sold to contractors and supervised the design of the original of the tool used by plaintiff at the time of the accident. This witness had patented several such devices; another of defendant's experts is named on more than thirty patents on powder actuated tools; and still another was a qualified ballistics expert. The claim is made, however, that the opinions given were in response to hypothetical questions unsupported by record evi-

dence or contrary to the evidence, and in the realm of speculation and conjecture as they were based on interpretations of photographs, physical conditions and test shots subsequent to the accident.

Expert witnesses for both parties examined the tool long after the accident and testified as to the results of test firings. One of plaintiff's theories was that the tool was defectively designed by reason of an unsuitable and inadequate protective shield and defectively designed gas ports, all of which was disputed by defendant's experts. Plaintiff's experts testified that the test shooting indicated the gun emitted the nail at an angle, whereas the test firings of defendant's experts indicated the contrary. It was defendant's theory that the safety shield would have protected the workman, provided the gun was properly maintained so that the barrel or shield did not stick and that the workman would position his head behind the safety shield when firing the gun. To clean the gun in accordance with the manufacturer's instructions was a simple matter. This would eliminate any sticking of the barrel or safety shield and prevent firing of the nail at any extreme angle.

Plaintiff testified that he never read the manufacturer's instructions which came with the tool and never cleaned the gun as this was his foreman's responsibility. Plaintiff also testified that he had never seen his foreman clean this gun except on one or two occasions and never while they were working on this particular job; that the only cleaning he saw the foreman do was by "running a rag through the barrel." When plaintiff finished his day's work he would put the tool in its box and give it to his foreman who would put the box in a large gang box with the other tools. Plaintiff testified that he had trouble once or twice with the tool's sticking. He would try to release it by pushing on some object, but if this proved unsuccessful he would turn it over to the foreman to be sent

out for repairs. The foreman contradicted plaintiff's testimony as to instructions given plaintiff and also testified that he cleaned the tool daily with a solvent recommended by the manufacturer.

Both plaintiff and defendant's experts examined photographs and measured the spalled out area on the ceiling caused by the shot which injured plaintiff. The surgeon who removed the nail from plaintiff's head gave it to him but it was not produced at trial. However, plaintiff did introduce x-rays showing the nail lodged in plaintiff's head and a picture showing the nail's curvature. Thus, the record showed the condition of the ceiling, the spalled out area caused by the shot, the length and curvature of the nail, and the depth and dimensions of the crater. Plaintiff introduced some fifty-three exhibits, including photographs of the tool used by plaintiff, pictures of the spalled out area of the ceiling, the nail removed from plaintiff's head, x-ray pictures taken during the surgery showing curvature of the nail, plaintiff's test shot results and pictures of the interior of the barrel of the tool, etc. In addition, one of plaintiff's witnesses was a professional photographer who testified as to the exact dimensions of the spalled out area of the ceiling. Also, there was the testimony of plaintiff, his foreman, doctors and others, plus the undisputed evidence that the nail used was not one of defendant's manufacture but a product of a competitive company that had a smaller shank than that recommended by defendant for use in this particular tool.

It was from the aforementioned evidence, coupled with the familiarity of the experts with the powder actuated tool, that they gave their opinion as to possible causes of the accident.

█ We have held many times that expert testimony is not objectionable because it invades the province of the jury. Jones v. Goodlove, 334 F.2d 90 (8th Cir. 1964).[2] Plaintiff's repeated objections to

---

2. "Once again we reiterate that 'this court is committed to the view that expert testimony is not vulnerable to an objection

that it invades the province of the jury; that the qualification of the expert and the question of whether expert opinion

practically every hypothetical question were apparently made under the impression that the questions invaded the province of the jury and were based on nothing more than speculation and conjecture. An example is set out in the margin.[3]

■ Additionally, the text of plaintiff's objections indicates his apparent belief that a proper hypothetical question must include all of the plaintiff's testimony. Plaintiff is mistaken, as a questioner is entitled to a witness' opinion on any combination of facts. This court said in Metropolitan Life Ins. Co. v. Armstrong, 85 F.2d 187, 190 (8th Cir. 1936), "a hypothetical question need not include all the facts in evidence, nor facts or theories advanced by opposing counsel." See also Taylor v. Reo Motors, Inc., 275 F.2d 699 (10th Cir. 1960); Standard Oil Co. v. Moore, 251 F.2d 188 (9th Cir. 1957); Ranger, Inc. v. Equitable Life Assur. Soc. of United States, 196 F.2d 968 (6th Cir. 1952); 2 Wigmore Evidence § 682 (3rd Ed.1940).

In this case the experts had the benefit of the record evidence alluded to above and their personal observations, the combination of which was the basis for their conclusions. Argument similar to that made by plaintiff was made in Deveny v. Rheem Mfg. Co., 319 F.2d 124, 130 (2nd Cir. 1963). The Second Circuit there said:

"It is argued that Judge Gibson erred in admitting the opinion testimony of plaintiff's expert Dr. John Outwater, which, we are told, was founded only upon speculation and surmise, and thus inadmissible under Vermont law. (Citation omitted.) Dr. Outwater's opinion as to the cause of the accident appears to us to have been based on his own personal observations of the condition of the control unit at the time at which he disassembled it, some five months after the accident. The record indicates that Dr. Outwater had previously recounted the facts of those observations. We hold this sufficient factual basis for opinion testimony to comply with the requirement of such cases as Platt, supra [Platt v. Shields, 96 Vt. 257, 119 A. 520]."

This court has recently held in Frank's Plastering Co. v. Koenig, 341 F.2d 257, 261 (8th Cir. 1965), that it was proper for an expert witness to reconstruct an accident by basing his opinion upon exhibits showing the physical facts as well as numerous photographs.

"Baker had before him the plan and profile showing the highway, Exhibit 1, as well as Exhibit 2, being a drawing showing exactly where the vehicles came to rest, the wheel marks that were made by the Bruggeman trailer from the black mark on the north curb to a point where the Bruggeman trailer came to rest, as well as numerous photographs; he was informed of the weight and velocity of each vehicle, the

---

upon the subject matter should be permitted are questions which should be determined by the trial court in the exercise of sound discretion. The trial court's ruling upon the admissibility of expert testimony will not be disturbed upon appeal in the absence of a clear showing of abuse of discretion.' (Citations omitted.) Of course, a trial court may abuse its discretion by allowing a seemingly qualified expert to exceed the permissible bounds of opinion testimony and enter into the realm of utter speculation and conjecture." 334 F.2d at 94.

3. "Q. Assume that the evidence is that the maximum depth of that hole is ⅝ of an inch and assume that the evidence has been that the depth of that hole was measured and it was found to be ⅝ of an inch deep at its deepest point.

"All right, now, looking at that pin, looking at that spalled out area, and assuming that the evidence is that that hole is ⅝ of an inch deep at its deepest point, at what angle would you say that that pin entered the concrete? ·

"Mr. Jackson: If the Court please, I object to that as a hypothetical question and as invading the province of the jury and asking for the ultimate. It asks this witness to indulge in pure speculation and conjecture based upon merely an interpretation of some photograph.

"The Court: Overruled.

"Q. (Mr. Sanders continuing) Now, would you answer?

"A. Well, I would say that the fastener for some reason or other has entered the concrete at what would be considered an 'extreme angle,' 25–35–40 degrees. * * *"

extent of engagement of the two vehicles, etc., from all of which he reconstructed the accident in reverse. We think his competency to be allowed to express an opinion therefrom came within the sound discretion of the trial court and no prejudice was involved in the receipt thereof. (Citation omitted.) We hold that the trial court was well within the permissibility rule when he allowed Baker's opinion to be received. (Citation omitted.)"

The trial court fully instructed the jury on opinion evidence with the admonition, "but, if you find that the facts stated in the hypothetical question are not established by the evidence, then the answers or opinions based thereon should not be given any weight or consideration by the jury." [4]

■■ Because of the seriousness of counsel's charges that defense strategy was a scheme to wholly confuse and mislead the jury by propounding hypothetical questions not based on record evidence, we have carefully canvassed the entire record. We conclude that there was ample evidence to justify the hypothetical questions; that it is not necessary to incorporate in the questions all of plaintiff's evidence or plaintiff's theory of the case; and that it was proper for the experts to base their opinions upon the photographs, exhibits, personal observations, tests and expertise in the field of powder actuated tools.

■■ Defendant's counsel in closing argument, over plaintiff's objection, was permitted to read extracts from the deposition of plaintiff which had been introduced in evidence. The deposition was lengthy, extending for over one hundred pages in the transcript. Immediately preceding this argument, plaintiff's counsel in addressing the jury while not reading from the deposition, referred to plaintiff's testimony by such remarks as "Jim said * * *" and "you heard Jim Barnes say * * *" Both parties had the right to refer to the testimony and argue any reasonable inference deducible therefrom, and it could not be expected that either would refer to it except in an effort to sustain their respective theories. In a sense, the defense argument was invited, and even if it was an impropriety to permit reading of portions of the deposition it was harmless. It is noted also that defendant had full opportunity to reply in his closing address to the jury and he could have under the court's ruling utilized extracts from the deposition if he had so chosen. In any event, reading extracts from the

4. Instruction No. 14:
"The rules of evidence ordinarily do not permit a witness to testify as to his opinions or conclusions. A so-called expert witness is an exception to this rule. A witness who by education and experience has become expert in any art, science, profession or calling may be permitted to state his opinion as to a matter in which he is versed and which is material to the case, and may also state the reasons for such opinion. You should consider each expert opinion received in evidence in this case and give it such weight as you think it deserves; and you may reject it entirely if you conclude the reasons given in support of the opinion are unsound."
Instruction No. 15:
"Certain hypothetical questions have been propounded from time to time in the trial of this case. A hypothetical question is one which assumes a certain state of facts to have been proved by the evidence, and calls upon the witness to assume all the facts stated in the question to be true, and express his opinion thereon. The value of such evidence depends upon whether the facts stated in the hypothetical question are correct and true and established by the evidence.
"If the facts stated in the hypothetical question are established by the evidence, then the opinions based thereon may and should receive just such weight and credit as you believe them entitled to receive.
"But, if you find that the facts stated in the hypothetical question are not established by the evidence, then the answers or opinions based thereon should not be given any weight or consideration by the jury."

deposition which was in evidence was a matter within the discretion of the trial court.[5]

The trial court in prefatory remarks explained to the jury that the case was being submitted to them upon plaintiff's two separate theories of recovery.[6] Immediately following, the court explained that the statement was set forth for the purpose of outlining the claims of the respective parties. It then proceeded to instruct the jury on both theories, advising in the instruction on the negligence theory that contributory negligence was a defense. The instruction on strict liability was in the following language:

"On the second theory of strict liability the Court instructs the jury that it is the law that one who makes and sells a product in a defective condition unreasonably dangerous to the user of the product, if the seller is engaged in the business of selling such a product and if the product is expected to reach the user in the condition in which it is sold, and this is so and is the law, even though the seller has exercised all possible care in the preparation and sale of his product from, or entered into any contractual relations with the seller.

"Therefore, you are told that your verdict must be for the plaintiff if you find and believe the following propositions:

"1. That the tool was unreasonably dangerous by reason of defective design of which the plaintiff was not aware.

"2. That the tool was being used in a manner in which it was intended to be used at the time of the injury.

"3. That the plaintiff's damages are a direct result of the defective design which makes the tool unreasonably dangerous.

"4. That the plaintiff has been damaged in some amount and extent thereof.

"However, if you find that any or all of the above propositions have not been proven by the plaintiff, then you cannot find for the plaintiff on the theory of strict liability.

"You are further instructed with relation to this theory of strict liability that the plaintiff is not required to prove that the defendant was negligent and it is not a defense that the defendant exercised all possible care in the preparation and sale of the tool."

The above instruction plainly and fully set forth the duty of the jury to find for the plaintiff if he had received his injury by a proper use of the tool if it found that the tool was unreasonably dangerous by reason of defective design. The instruction did not mention contributory negligence but the last sentence emphasized the fact that plaintiff's recovery did not depend on proof of defendant's negligence and that it was no defense that defendant exercised all possible care in the preparation and sale of the tool.

■■ Plaintiff argues that the above instruction was confusing and particularly so in the light of the court's prefatory remarks. Plaintiff maintains that the particular instruction should have contained a specific admonition that con-

---

5. "It is within the discretion of the court to grant or to refuse permission to counsel to read to the jury from depositions of witnesses which have been read in evidence." 88 C.J.S. Trial § 175 (1955).

6. "Plaintiff asserts two theories for recovery from the defendant. It is asserted that the defendant was guilty of negligence which directly resulted in plaintiff's damages. It is contended that if the defendant is not liable on this theory, the defendant is liable on the theory of strict liability. It is proper to rely on alternative theories of recovery.

"The defendant denies the above allegations and contends that the plaintiff was guilty of contributory negligence.

"This in substance is a statement of the issues."

tributory negligence was not a defense in order for it to be a complete and clear charge. We do not agree as the instruction appears to be plain, simple and complete in that it required the jury to return a verdict for the plaintiff if such was justified under the law of strict liability. As a reviewing court, we can only assume that the jury understood and followed the plain and clear instructions of the court. Stephan v. Marlin Firearms Co., 353 F.2d 819 (2nd Cir. 1965); Yeargain v. National Dairy Products Corp., 317 F.2d 779 (8th Cir. 1963). The trial court is not required to give instructions in any particular form nor to instruct on principles fully and fairly presented by other instructions. Mounds Park Hospital v. Von Eye, 245 F.2d 756, 70 A.L.R. 2d 335 (8th Cir. 1957). It is sufficient if the jury is charged with the applicable law. Partlow v. Golstein, 263 F.2d 169 (8th Cir. 1959).

In our opinion, the jury was fully and fairly instructed on both of plaintiff's theories and no prejudicial error resulted from the court's instructions when considered as a whole.

Throughout his brief, plaintiff has contended that defense counsel deliberately set about to confuse the jury and that a combination of the asserted errors resulted in an unfair trial. The printed record does not so indicate. This trial was technical, protracted and important to both parties. It was bitterly contested and counsel for both parties represented their clients vigorously and capably, but there is no indication from the record that the trial court ever lost control of the case or of any unfairness on the part of either counsel. The jury saw fit to return a verdict for the defendant and unquestionably there is solid evidentiary basis for this result. If the jury had found under the record here for the plaintiff, we, as a reviewing court, would have had no alternative but to affirm. Since we are convinced that no prejudicial error occurred, the judgment is affirmed.