**GRAND ISLAND GRAIN COMPANY, Inc., Appellant,**

v.

**ROUSH MOBILE HOME SALES, INC., Appellee.**

**No. 18800.**

United States Court of Appeals Eighth Circuit.

March 19, 1968.

Gordon H. Miles, of Haney, Walsh &
Walentine, Omaha, Neb., for appellant.

L. J. Tierney, of Cassem, Tierney, Adams & Henatsch, Omaha, Neb., for appellee, Howard E. Tracy, of Luebs, Tracy & Huebner, Grand Island, Neb., on the brief.

Before VOGEL, Chief Judge, and MATTHES and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

On February 15, 1963, at the municipal airport at Grand Island, Nebraska, a destructive fire occurred in a hangar leased by Grand Island Grain Company and used by it for the storage of wheat. The grain company instituted this diversity suit against Roush Mobile Home Sales, Inc., alleging that Roush was negligent and that its negligence caused the fire. At the conclusion of the plaintiff's case Chief Judge Robinson sustained Roush's motion, under Civil Rule 50(a), for a directed verdict. Judgment was entered accordingly. The grain company appeals.

The general facts are not in dispute. In the fall of 1962 the United States Air Force arranged to rent a trailer and to use it at the airport as an operations headquarters office. It employed Roush to move the trailer there. Roush placed it south of the hangar, near the southeast corner, about 190 feet away and facing north. The Air Force then employed an electrician named Fuller to supply electricity to the trailer. He accomplished this by running a cable from the trailer to an outlet inside the hangar. The grain company gave permission for this connection.

Just before Christmas 1962 the Air Force discontinued its use of the trailer. The vehicle, however, was not then removed. It remained where it was until the day of the fire. Roush was engaged to take it away that day. It did so. A well-advanced fire appeared in the hangar a short time, perhaps a half hour, after the trailer was moved.

No question is raised as to the substantial amount of the damage sustained by the grain company in the fire.

The plaintiff's theory is that Roush was negligent in failing, before the move, to disconnect the cable running from the trailer to the hangar; that, when the trailer was moved, the cable was pulled out and a short circuit resulted; and that this caused the fire. Defendant Roush's position is that the removal of the trailer had nothing to do with the fire and that the cable had been disconnected beforehand. It asserts that the ultimate question is not how or when the fire started but whether electricity was connected to the trailer when it was moved.

With the trial court's granting the defendant's motion for a directed verdict at the conclusion of the plaintiff's case, and with this ruling vigorously challenged here, we must look at the testimony of each primary witness for the plaintiff in some detail:

*Howard E. Fuller:* He is a licensed electrician. He connected cable (No. 12 Romax) to a receptacle box he placed on the trailer. He drilled holes through a girder on the underside of the trailer and attached the box there with bolts and nuts. He buried the cable between the trailer and the hangar in a trench. He ran the cable through an existing aperture in the south wall of the hangar and plugged it into the last outlet east inside that wall. He traced the wiring on the inside of the building. It ran along the wall about three feet above the floor west to an outlet box and then up over a cement pilaster north and down to a fuse box on the north wall of the hangar's south corridor. This box contained the fuse for the circuit on which the trailer was thus included. Wires ran from the fuse box to the outlet box where they split to comprise separate circuits east and west. Inside the building there was no insulation except that which was on the wiring itself. He told the Air Force officer that the wiring to the trailer was "strictly temporary" and that he could take it with him when he left.

*Richard L. Simpson:* He is chief of the Grand Island fire department. The alarm for the fire came in at 3:26 p. m. When he arrived at the scene a great

quantity of smoke was emerging from the west side of the hangar. The dormer on the south had already burned out. Then the fire broke through the west side.

He returned to the site the next morning. At the place where the trailer had been parked he saw the cable sticking up out of the ground. It was bent to the north. Its two bare ends were crossed and brazed together. He conferred with Farnsley, the Roush employee who had moved the trailer both to and from the airport. Farnsley told him that when he removed the trailer he disconnected the fuel line and walked around the trailer but did not see anything and so he hooked it up and pulled it away. "He made no statement at that time that he looked under the trailer and observed any wires. I asked him whether he had looked under the trailer and he said that he saw nothing". The chief, with his assistant and the state fire marshal, then went to where the trailer had been moved. "I looked under the trailer and I saw no electrical box * * * anywhere under the trailer". He "would not want to state that the box was not underneath the trailer".

On the day after the fire he could not get to the fuse box inside the building because the bulkhead holding the grain had burned away and wheat covered the box. He knew it was affixed to a wood wall. He asked that the salvage crew notify him when it was uncovered but no one ever called. A week later, when he returned to the site, the box had been removed. At that time he found a fuse box lying in a pile of debris in the south side of the hangar but he did not know which one [there had been more than one in the building] it was. It was of no use to him and he ignored it. He did not find or get any report of any fuse which had been blown.

*Glenn Van Osdall:* He is a master electrician. He rewired the hangar in 1961–62 to place its power equipment on a system separate from the lights. In referring to the cable from the trailer to the hangar he observed no evidence of excessive heating at either end. The hangar end showed evidence of burning "but if the electrical current burned the wire, I would say it would damage the rest of the insulation as well, not just the one point".

*William V. Warren:* He was president and a shareholder of the grain company at the time of the fire. The company's installation at Grand Island was at the airport. The cable from the trailer went into the hangar about 20 feet west of the southeast corner of the building. The day after the fire he looked at the trailer site and "found the wire pulled straight out in the direction that the trailer had been moved, and the ends were fused together". He saw no lights in the trailer after the Air Force discontinued using it about Christmas and saw nothing to indicate that there was any electricity in the trailer. The fuse box was located "on the north wall of the south wing" and not on "the very south wall". In between was empty space of approximately 20 feet. There were several kinds of fuses in the different fuse boxes. The light circuit was on a breaker box. He did not know of his own knowledge how the wire in the trailer became fused.

*Gordon H. Miles:* He is an attorney associated with the firm representing the grain company in this litigation. He investigated the fire site on March 19 and again on March 29, 1963. The trailer was not on the premises on the former date but was there again on March 29, faced in a different direction (east) and about 190 feet from the hangar. He looked under the trailer and located a receptacle box attached to a cross-member. He removed the box. He did not know when it was placed there. The girder of the trailer was not bent in any way. The north half of the hangar was burned out. The southwest corner of the building never did burn. A photograph introduced in evidence shows the fire burning from north to south. On March 19 he found a fuse box in the debris in the south corridor. He did not know how it got in its then condition.

*Joseph J. Gilgan:* He resides in Seattle, is an electrical engineer, and has done post-graduate work in electromagnetic theory. He visited the airport in 1964

and made an electrical inspection in the hangar buildings. When a panel box is damaged from the outside in a non-electrical fire there is a normal amount of burning of the paint and defacing of the finish. When such a box is damaged by a fire starting inside it there is evidence of arcing. There are copper globules and whitened spots on the inside. It was his opinion that the box which witness Miles found in the debris gave evidence of electrical arcing inside it. Copper beads there were what was left of the bus bars. There was a hole burned in the face and this can be created only by an arc. The bus bars, the fuse holders and the fuses were practically disintegrated. This is accomplished only by bus arcing. An arc rates from 3500 to 5000 degrees centigrade. Electrical designers must guard against arcing and maintain preventative insulation values. The box taken from the debris is similar to boxes he saw in the other hangar buildings.

There had to be sufficient voltage and current to heat the cable metal to a point where its wires would braze. Copper has a melting point of 2000 degrees Fahrenheit. The heat there was confined to a relatively small area. Through a mock-up he was able to get two wires to braze. He found the amperes to be 29. Thus, he reasoned, the circuit carried a 30 ampere fuse at the time the wires were brazed. There can be a short circuit on a line without a fuse blowing. The arc in the panel box could sustain itself for 10 or 15 seconds before a fuse blew. An arc for that length of time would turn the box cherry red at about 1370 degrees Fahrenheit. This would ignite a wood wall which has an ignition temperature of 750 degrees.

He measured the ends of the cable wires. They were less than the tolerance on the manufacturer's specifications. He concluded that the wire had a strong force pulling and elongating it. A minimum of 350 pounds would be required to elongate the wires.

He was never in the hangar either before or after it burned. There were splices in the wiring in the other build-

ing. He never saw the box taken from the debris but was testifying from a picture of it. He had no way of knowing the wiring in the hangar. The standard ampere rating for No. 14 Romax wire is 15 amperes. This calls for a 15 ampere fuse. If it has a larger one, it is overfused. The wire to the trailer was 12 gauge but in the building it was 14 gauge.

A short series of hypothetical questions was then propounded to Mr. Gilgan. To each of these an objection was made and sustained. Offers of proof were submitted to the effect that the witness would testify that an assumed short circuit caused by the brazed wires would occasion arcing in the fuse box inside the hanger which would create extreme heat and ignite the surrounding area, and that the cause of the fire in the hangar was the short circuit in the wire caused by the trailer's pulling out.

We feel that all this evidence may be summarized as appropriately establishing: (1) a cable connection from the trailer to the hangar which was attached and functioning until about Christmas 1962; (2) thereafter, an unused and dark trailer; (3) an electrical intake receptacle temporarily installed on the trailer; (4) the mover's not observing any cable connection to the trailer on February 15 although he disconnected the fuel line and the ground wire on that date; (5) uninsulated lines inside the hangar (except for the insulation on the wire itself) running along walls of wood and through wood joists; (6) an advanced fire in the hangar within a half hour of the trailer's removal; (7) movement of the fire from north to south in the face of a south wind; (8) the fire chief's not observing the presence of any electrical receptacle on the trailer shortly after the fire; (9) a fuse box observed a week later in the debris in the general hangar area where the box which served the line to the trailer had been located; (10) the presence of such a box there on March 19; (11) the similarity of that box to another used in the hangar; (12) indications of arcing in this debris box;

(13) the trailer end of the cable pulled in the direction of the removal, elongated and brazed; (14) the hangar end burned but with an indication that the burning was not by electrical current; and (15) the presence of an electrical receptacle on the trailer when it was on the premises again on March 29.

But we also feel that all this evidence affords no direct proof (1) of a connected and live electrical line from the trailer to the hangar on the day of the fire; (2) of the then presence of an inlet receptacle on the trailer; (3) of the plug-in of the cable to that receptacle; (4) of the plug-in of the cable to the outlet inside the hangar; (5) of a short circuit at the trailer end of the cable; (6) of arcing in the particular fuse box on the south corridor wall; and (7) of the inception of the fire at that fuse box. All these links in the plaintiff's case are left to inferences resting on circumstantial evidence.

The plaintiff claims that the trial court erred in two respects, namely, in sustaining the objections to the hypothetical questions and offers of proof, and in granting the motion for a directed verdict. The two issues blend into one but we comment on each:

I. The hypothetical questions. The argument here is that Civil Rule 43(a) is liberal and favors the reception rather than the rejection of evidence; that the cause of the fire could be explained only by a qualified expert in the field of electricity; that Mr. Gilgan's qualifications were not questioned; that he had knowledge of the wiring system at the Grand Island hangars; that the facts included in the questions were properly inferable; and that the usual safeguards (the disinterest of the witness; the jury's ability to decide whether the facts were correctly hypothesized; opportunity to cross-examine; and the court's anticipated instructions as to weight) favor the allowance of the questions. Four cases are cited as supporting authority. Two are vehicle point-of-impact cases. Frank's Plastering Co. v. Koenig, 341 F.2d 257 (8 Cir. 1965); Campbell v. Clark, 283 F.2d 766 (10 Cir. 1960). The third concerns

life expectancy. Metropolitan Life Ins. Co. v. Armstrong, 85 F.2d 187 (8 Cir. 1936). The fourth has to do with the cause of death of cattle. Hartford Fire Ins. Co. v. Thompson, 175 F.2d 10, 14–15 (8 Cir. 1949).

This court on a number of occasions has stated that the appropriateness of a hypothetical question is a matter largely for the discretion of the trial court. Metropolitan Life Ins. Co. v. Armstrong, supra, p. 190 of 85 F.2d; Frank's Plastering Co. v. Koenig, supra, p. 261 of 341 F.2d; Lofton v. Agee, 303 F.2d 287, 288 (8 Cir. 1962), where we approvingly cited Campbell v. Clark, supra.

It is a general rule, also, that a hypothetical should remain within the evidence and include only such facts as are supported by the evidence or which the evidence tends to prove. On the other hand, it need not include all the facts pertinent to the ultimate issue. 32 C.J.S. Evidence §§ 549–552 (1964); 58 Am.Jur. Witnesses, § 854 (1948). Specifically, this court has said, "A hypothetical question need not include all the facts in evidence, nor facts or theories advanced by opposing counsel". Metropolitan Life Ins. Co. v. Armstrong, supra, p. 190 of 85 F.2d; Barnes v. Omark Indus., Inc., 369 F.2d 4, 8 (8 Cir. 1966).

But where a hypothetical embraces an important fact not supported by the evidence, it is defective and subject to objection. Solomon Dehydrating Co. v. Guyton, 294 F.2d 439, 444 (8 Cir. 1961), cert. denied 368 U.S. 929, 82 S.Ct. 366, 7 L.Ed.2d 192; Aetna Life Ins. Co. v. McAdoo, 106 F.2d 618, 622 (8 Cir. 1939); Flory v. Holtz, 176 Neb. 531, 126 N.W.2d 686, 691–692 (1964); Wessel v. City of Lincoln, 145 Neb. 357, 16 N.W.2d 476, 481 (1944); McNaught v. New York Life Ins. Co., 143 Neb. 213, 9 N.W.2d 160, 12 N.W.2d 108, 113 (1943). Chief Judge Vogel, in speaking for this court in Harris v. Smith, 372 F.2d 806, 812 (8 Cir. 1967), quoted with approval the following pronouncements of other circuits:

" ' * * * Where a hypothetical question leaves out facts in evidence which

so qualify the facts included that an answer to the question would be misleading and based upon inadequate premises, objection to the question should be sustained.' * * *

" ' * * * A question which omits any material fact essential to the formation of a rational opinion is likewise incompetent. * * * ' "

■ With these principles in mind, we conclude that the trial court's rulings sustaining the objections to the hypothetical questions and to the offers of proof were correct. We so hold because the questions omitted pertinent established facts essential to the formation of a rational opinion and embraced assumptions far too frail and speculative in the light of the evidence adduced:

a. The questions included no mention of the absence of insulation, other than covering on the line itself, for the wiring inside the hangar.

b. The fuse box to which the hypotheticals referred was never singled out as the one to which the trailer circuit was attached. It might have been that one but it also might have been another located elsewhere in the hangar, perhaps on the north side, and having no connection with the trailer.

c. The hypotheticals necessarily assumed that on February 15, 1963, the cable was still live and connected to the trailer and was plugged in the outlet inside the hangar. This was true so long as the Air Force was using the trailer. But that use ceased. Nothing in the evidence indicates that the connection continued. What evidence there is looks, instead, the other way. The trailer stood dark for over seven weeks. The plaintiff's president, whose office was at the airport, saw no lights in the trailer or anything to indicate that it had electricity during that period. The connection was temporary. The investigating fire chief, who should know what to observe, saw no inlet receptacle under the trailer. Farnsley, who had moved the trailer before, disconnected the fuel line and the ground wire but saw nothing else.

d. The hypotheticals embraced the assumption that a short circuit took place at the trailer end of the cable. Despite their reference to the brazing of the wire ends there, they contained nothing about the absence of indication of excessive heating at either end of the cable and did not recite that the hangar end's condition was not consistent with burning by electrical current.

e. Photographic exhibits demonstrate that the fire, despite the south wind, worked the hangar from north to south, a direction toward, rather than from, the fuse box and cable. The wind and the fire direction were not mentioned in the hypotheticals.

II. The sufficiency of the evidence. With the hypotheticals eliminated the plaintiff's case becomes almost impossibly thin. Nevertheless, the plaintiff asserts that it was still entitled to get to the jury.

■■ Inasmuch as the fire and all events connected with it occurred in Nebraska, the parties appear to assume that the substantive law of that state controls. Once again, we observe that the question whether state or federal law prevails on the issue of sufficiency of the evidence remains an open question. Dick v. New York Life Ins. Co., 359 U.S. 437, 444–445, 79 S.Ct. 921, 3 L.Ed.2d 935 (1959). In our cases arising from Nebraska we have concluded that federal and Nebraska standards are substantially the same. Wray M. Scott Co. v. Daigle, 309 F.2d 105, 107–109 (8 Cir. 1962); Chicago B. & Q. R. R. v. Beninger, 373 F.2d 854, 856 (8 Cir. 1967); Farmers Co-op. Elevator Ass'n v. Strand, 382 F.2d 224, 228 (8 Cir. 1967), cert. denied 389 U.S. 1014, 88 S.Ct. 589, 19 L.Ed.2d 659. We have outlined those standards in these cases. They are well known and accepted and need not all be repeated here. We mention only two which concern circumstantial evidence: in order to get to the jury the circumstances proved, together with the inferences legitimately to be drawn from them, shall indicate with reasonable cer-

tainty the negligent act charged; if such evidence is susceptible to any other reasonable inference, inconsistent with the inference of negligence, it is not sufficient to carry the case to the jury. Graves v. Bednar, 171 Neb. 499, 107 N.W. 2d 12, 15 (1960); Bedford v. Herman, 158 Neb. 400, 63 N.W.2d 772, 774 (1954); Ford Motor Co. v. Mondragon, 271 F.2d 342, 345 (8 Cir. 1959); Wray M. Scott Co. v. Daigle, supra, pp. 108–109 of 309 F.2d.

We feel that the plaintiff has not sustained this burden. All that has been said above with respect to the hypotheticals applies here. There are too many facts left unproved or which, though proved, are no more than circumstantial and support inferences inconsistent with the plaintiff's theory: the lack of proof of the cable's connection; the clear possibility that the fire originated elsewhere in the building than in the south corridor fuse box; the condition of the cable's hangar end; the advanced state of the fire shortly after the trailer was moved; the movement of the fire toward the south.

The plaintiff, however, places great reliance on the Nebraska blow torch case of Howell v. Robinson Iron & Metal Co., 173 Neb. 445, 113 N.W.2d 584 (1962). At the close of the plaintiff's case there the trial court sustained the defendant's motion for a directed verdict. The record showed that attached to the building in question was a two-level wooden structure. It contained old icemaking equipment sold to the defendant under an agreement for its removal. The removal required cutting of the metal by acetylene torches. The defendant cleaned up rubbish and loose material but did not sweep out accumulated dust. It proceeded to cut the metal. One employee watched to see that no fires were started by sparks. The men stopped work and left the premises about 5:10 p. m. The fire was reported two and a half hours later.

The court held that the evidence raised a question for the jury. It emphasized the use of the torch; the heat generated; the flying sparks; the failure to use baffle plates; the cutting throughout the building; the unswept floor; the accumulation of combustible dust; and the absence of evidence that, when work ceased, an effort was made to ascertain whether live sparks were in the building or whether persons other than the defendant's employees had been there.

Less than three years later a sharply divided Nebraska court decided another blow torch case. Sears v. Mid-City Motors, Inc., 178 Neb. 175, 132 N.W.2d 361 (1965). Pipes of a sprinkler system were being removed. Shielding was not used. The workmen, leaving in mid-afternoon, checked for fire and found none. The first alarm came early the next morning. The Howell case was cited by both sides. The majority felt it was factually dissimilar as to control of the building, floor condition, lack of inspection, and the absence of other persons. They felt that there was a failure to show that any negligent act caused the fire. The minority felt otherwise.

The case, however, went to reargument. Sears v. Mid-City Motors, Inc., 179 Neb. 100, 136 N.W.2d 428 (1965). The earlier opinion was withdrawn and a larger majority, reciting fewer facts, concluded, p. 430, "Since causation is not reasonably inferable, the order of dismissal is right * * * It is enough that in law the time between pipe cutting and fire detection was too long under the circumstances".

A recent Nebraska circumstantial evidence fire case is R & S Corp. v. Barnes, 182 Neb. 431, 155 N.W.2d 379 (1967). There the court upheld the granting of the defendant's motion for a directed verdict. "It will be noted that there is no direct evidence of how the fire started. * * * There is no evidence to show that this basket was used for the purpose of receiving ashtray contents or floor sweepings nor is there any evidence to contradict the possibility of the fire having been started by defective electrical wiring. * * * [W]e are disposed to and do find that the evidence of negligence on the part of defendant is too

conjectural and speculative to require a reversal of this case".

See, also, Mischnick v. Iowa-Nebraska Light & Power Co., 125 Neb. 598, 251 N.W. 258 (1933); and Watenpaugh v. L. L. Coryell & Son, 135 Neb. 607, 283 N.W. 204 (1939).

 It is apparent, we think, that the *Howell* case is far more favorable factually for its plaintiff than is the present record for the grain company here and that the *Sears* and *R & S Corp.* cases resemble this one. We paraphrase the language the Nebraska court used in R & S Corp. v. Barnes, supra, p. 381 of 155 N.W. 2d: To sustain the plaintiff's case, not one, but several inferences must be drawn —first, that the fire originated in the fuse box on the wall in the south corridor of the hangar; second, that it was caused by a short circuit in the trailer end of the cable; third, that the short circuit was itself occasioned when the trailer was moved by the defendant; fourth, that when the trailer was so moved the cable was connected to it and at the hangar; and fifth, that Farnsley, although he saw and disconnected the fuel line and the ground wire, and although he looked, failed to see what would have to have been in plain view, namely, the cable connected to the trailer. There is no direct proof as to any of this. All must be established by inference. These multiple inferences provide a base "too conjectural and speculative to require a reversal".

From its holdings in *Howell, Sears* and *R & S Corp.*, we think it clear that the Nebraska court on the present record would hold the evidence insufficient to justify the submission of the case to the jury. We are not prepared to say that a different result is required under any federal standard.

We, of course, recognize that it is possible that the hangar fire at Grand Island on February 15, 1963, was occasioned in the manner and by the cause which the plaintiff alleges. Our holding here is that the proof falls short of establishing this with the requisite reasonable degree of certainty. The present case may be another of many in the law books where

the action fails because, for one reason or another, the proof could not be produced. This plaintiff will never be convinced that its theory of the cause of this fire is not the correct one, and this defendant, similarly, will never be convinced that the plaintiff's theory is right. Lawsuits, however, must still be proved. No better method for their resolution has been found.

Affirmed. Half the cost of the supplemental record may be allowed.